J-S16029-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                          :       PENNSYLVANIA
                                            :
         v.                                 :
                                            :
                                            :
COLE FRANCIS DUFTON,            :
                                            :
          Appellant            :     No. 1883 EDA 2022

Appeal from the Judgment of Sentence Entered June 9, 2022
In the Court of Common Pleas of Wayne County Criminal Division at
No(s): CP-64-CR-0000143-2019

BEFORE: DUBOW, J., MURRAY, J., and McCAFFERY, J.

MEMORANDUM BY MURRAY, J.:             **FILED JUNE 23, 2023**

    Cole Francis Dufton (Appellant) appeals from the judgment of sentence imposed after a jury found him guilty of first-degree murder.[1] We affirm.

    Appellant's conviction arises out of the murder of Suzette Bullis (victim) at her home on or about December 19, 2018. The parties stipulated at trial:

> [The victim] resided alone at 10 Como Road, Lakewood, Wayne County, Pennsylvania. … [The victim] had significant health problems including a prior brain aneurysm. [Appellant] … resided at 273 South Preston Road, Pleasant Mount, Wayne County, Pennsylvania [(Appellant's home)]. [Appellant's] home was owned by … the parents of Alexa Sampson[ (Sampson), Appellant's paramour.] … [Appellant] had been electrocuted in a work accident, and this ultimately led to the surgical removal of his left arm. [The victim] would sometimes sell her prescription [medication] to obtain money. She and [Appellant] were friends and would, on occasion, provide each[]other with medication that they both had been prescribed.

---

[1] **See** 18 Pa.C.S.A. § 2502(a).

N.T., 3/21/22, at 49-50 (breaks and numbering omitted).

The victim's adult daughter, Andriana Bullis (Bullis), testified that she traveled to the victim's home for a visit the morning of December 19, 2018, and discovered her motionless on the floor in a pool of blood. *Id.* at 59, 62. After checking the victim's pulse, Bullis called 911. *Id.* at 64.

Pennsylvania State Police (PSP) Trooper James Hitchcock (Trooper Hitchcock) responded to the victim's home and collected and processed evidence. In addition to numerous medication bottles, *see id.* at 82-83, 89, Trooper Hitchcock found in the victim's master bedroom, nearby her body, a "bullet … lodged inside a comforter…." *Id.* at 87. Trooper Hitchcock explained:

> The bullet was relatively intact. … One thing that was unique about it, it had a red coating on it. I'm not sure what the coating was, but … I don't see many of those at all.

*Id.* at 88. Trooper Hitchcock also found a "spent" nine-millimeter shell casing on the carpet "just above" the victim's body. *Id.* at 85. Trooper Hitchcock, who was wearing gloves, placed the evidence in evidence bags and transported it to the PSP barracks. *Id.* at 87, 89. On cross-examination, Trooper Hitchcock detailed the process he employed in collecting, packaging, and inventorying the evidence. *Id.* at 112-14, 127-30.

Appellant's paramour, Sampson, testified for the Commonwealth that Appellant resided with her and their young child at Appellant's home in December 2018. N.T., 3/22/22, at 6. Sampson stated Appellant was close

- 2 -

with the victim and "considered her his aunt." *Id.* at 10. Sampson had witnessed Appellant and the victim engage in drug transactions, and stated Appellant would abuse pain and sleeping medications. *Id.*

Sampson described a trip that she and Appellant took to a local gun store, Front Line Armory (the gun store), a few weeks before the murder "because [Appellant] wanted to buy a gun." *Id.* at 11. Sampson stated since Appellant "didn't have a valid ID[,] I had to do the paper[]work for him." *Id.* at 12; *see also id.* (Sampson testifying Appellant paid for the handgun). At that time, Sampson believed Appellant had purchased a 22-caliber handgun. *Id.* at 13. Sampson testified that Appellant used the handgun "three or four days a week," shooting "empty beer cans and stuff … in the barn," despite his missing left arm. *Id.* at 16. Appellant also occasionally carried the gun. *Id.* at 17.

Sampson testified she was with Appellant December 18, 2018, and they ran errands in their car. *Id.* at 17-18. According to Sampson, "[Appellant] seemed kind of irritated and uncomfortable" that day. *Id.* at 18. Upon returning to Appellant's home, Appellant informed Sampson that "he was going to [the victim's] house." *Id.*; *see also id.* at 19 (Sampson stating that although Appellant alleged he was visiting the victim to console her following the death of her paramour, Sampson suspected Appellant's real motivation was "[t]o get pills."). Sampson testified Appellant left in a car and was gone for approximately "twenty-five, thirty minutes." *Id.* at 20. Upon Appellant's

return, Sampson heard him set something down in the bedroom on a nightstand. *Id.* at 21. Sampson checked the nightstand and discovered an unlabeled bottle containing "little and green" pills. *Id.*

Sampson further testified that the following day, December 19, 2018, Appellant informed her that he needed to travel to Scranton, with their young child, to "go shopping." *Id.* at 22; *see also id.* at 23 (Sampson stating it took "about fifty minutes" to drive to Scranton). Sampson stated that this was unusual for Appellant because

> he doesn't have a driver's license and he didn't even really like driving [locally] because of that fact[,] and he [] had a hard time taking care of [Appellant's child] on his own in general … so it was just weird for [Appellant] to take [the child] shopping with him.

*Id.* at 23. Sampson confirmed that Appellant "bought himself a new shirt on December 19th when he went to Scranton[.]" *Id.* at 52. Later that day, Sampson learned about the victim's murder. *Id.* at 23.

Police traveled to Sampson's workplace on December 19, 2018, and interviewed her and Appellant separately. *Id.* at 23-24. Sampson conceded that she initially lied to police about ownership of the handgun she had purchased from the gun store in October 2018, stating "the gun … was mine because it was under my name." *Id.* at 24. Sampson explained her motivation for lying: "I hadn't known what had happened at that time so I guess I was just protecting [Appellant]." *Id.* Sampson eventually told police that Appellant actually owned the handgun, which he stored in their bedroom at Appellant's home. *Id.* at 25. Sampson gave police permission to take

- 4 -

possession of it. *Id.* When Sampson later informed Appellant that police had retrieved the handgun from Appellant's home, Appellant "asked me why I would let them take the gun[,] and I told him that we hadn't done anything so I had no reason not to let them take the gun." *Id.* at 26; *see also id.* (Sampson acknowledging that Appellant "express[ed] frustration with [Sampson for] having turn[ed] the gun over").

The victim's neighbor, Robert Cone (Cone), testified for the Commonwealth that police interviewed him shortly after discovering the murder. *Id.* at 212. Cone regularly went inside the victim's home to bathe, with her permission. *Id.* at 210. Cone was familiar with Appellant. *Id.* Cone described to police a dispute he witnessed between the victim and Appellant in late November or early December 2018. *Id.* at 211. The following exchange transpired between Cone and the prosecutor with respect to that dispute:

> Q: Without saying what might have been said[,] can you describe what you physically observed [Appellant] doing?
>
> A: [Appellant was v]ery agitated, … very nervous.
>
> Q: [] At any point sir did [Appellant] display a gun?
>
> A: Yes.
>
> Q: And what did he do with the gun …?
>
> A: Yes, he pulled it out, was waving it around, and then he ejected the bullet from on his leg with his good arm….
>
> Q: And did you observe when he ejected the bullet what the bullet looked like?

* * *

A: Yeah it was [] a red tip bullet….

Q: … [W]ere you concerned when you saw all of this happening?

A: Yeah, I asked [the victim] if she was alright with it….

*Id.* at 211-12. Finally, Cone testified that on December 19, 2018, he returned to his home at approximately 8:45 p.m. and noticed something "odd" concerning the victim's home. *Id.* at 213-14. According to Cone, the victim usually "would shut all the lights off and go to bed" prior to 8:45 p.m., *id.* at 214, but that evening, the victim's "whole house was light up [*sic*]."[2] *Id.* at 213.

PSP Trooper Brian Decker (Trooper Decker) testified he responded to the scene of the murder on December 19, 2018, in his role as a criminal investigator with the PSP Honesdale barracks. N.T., 3/23/22, at 54. Trooper Decker encountered and interviewed Cone at the scene. *Id.* at 67. Cone described to Trooper Decker the aforementioned confrontation he had witnessed between Appellant and the victim shortly before the murder. *Id.* Trooper Decker stated Cone's account "dr[e]w my interest to talk with [Appellant] because he was someone that had a handgun, and he was at [the victim's] house, and he was agitated." *Id.* at 67-68. Thus, Trooper Decker

_____

[2] It is undisputed that there were no eyewitness accounts of the murder.

traveled to question Appellant, who voluntarily gave two separate, recorded interviews after waiving his **Miranda**[3] rights. **Id.** at 68, 71, 73.

Through Trooper Decker's testimony, the Commonwealth introduced into evidence transcripts of Appellant's police interviews (Exhibits 63, 64, & 65, respectively). **Id.** at 76. Appellant stated in the first interview that he went to the victim's home on December 18, 2018, for a brief visit to check on her. Transcript (Ex. 63), 12/19/22, at 7-10. Appellant claimed he owned rifles for hunting purposes, but "I don't own any pistols." **Id.** at 24, 30; **see also id.** at 31-32 (Appellant stating Sampson and her parents owned handguns that were stored in a gun safe inaccessible to Appellant). Trooper Decker then described to Appellant Cone's statement about witnessing a dispute between Appellant and the victim before the murder. **Id.** at 24. Appellant disputed Cone's account, stating: "I didn't have a gun with me and didn't say I was going to take care of them." **Id.** at 25. Appellant claimed he only occasionally obtained pain medication from the victim, and denied that the victim ever owed Appellant money. **Id.** at 33, 66-67.

Trooper Decker conducted a second interview of Appellant later that same day (after other police officers had seized the handgun from Appellant's home). Appellant stated he "was not aware of" the firearm's existence and that Sampson had control of it. Transcript (Ex. 64), 12/19/22, at 3-4. Finally,

---

[3] **See Miranda v. Arizona**, 384 U.S. 436 (1966)

Trooper Decker testified that the following day, Appellant contacted police via phone and stated he had not been entirely truthful in his prior interviews. Transcript (Ex. 65), 12/20/22, at 4. In response to Trooper Decker's question about what "[Appellant was not] truthful about," Appellant stated:

> I did know that [Sampson] got it[, *i.e.*, the handgun]. Right away, I didn't know when she purchased it but she was like oh I treated myself. I did know that she had it. [] I didn't want to get in trouble for [] carrying [a firearm] without a concealed or open carry [permit]. … [] I did bring it to [the victim's] house that one day. …

*Id.* at 4. Appellant also repeated that although he did visit the victim at her home shortly before the murder, he had no involvement in it; the victim did not owe Appellant money; and Appellant did not obtain any medication from the victim. *Id.* at 31-32.

PSP Sergeant Lori Kistle (Sergeant Kistle) testified in her role as the criminal investigation unit supervisor at the PSP Blooming Grove barracks in December 2018. N.T., 3/21/22, at 182-83. Sergeant Kistle stated she was assigned to travel to Appellant's home and retrieve, *inter alia*, the handgun Sampson described to police. *Id.* at 183. Sampson led Sergeant Kistle to her and Appellant's bedroom. *Id.* at 184-85. Sergeant Kistle found, inside a gun cabinet, "a nine millimeter [] handgun [(Taurus G2C firearm)] and nine millimeter ammunition." *Id.* at 185; *see also id.* at 190 (Sergeant Kistle testifying the Taurus "G2C [firearm bore] Serial Number TL07330"). Sergeant Kistle testified the Taurus G2C firearm was "empty [and] out of it[]s holster,"

a "magazine was seated in the weapon, and both the weapon and the magazine were empty." ***Id.***

Judy Banks (Banks) testified she owned and operated the gun store with her husband, Richard Banks. ***Id.*** at 150. Banks testified that on October 17, 2018, Appellant and Sampson bought from her store "a Taurus G2C 9MM handgun and ammo." ***Id.*** at 151; ***see also id.*** at 156 (Banks stating the serial number of the Taurus G2C firearm was "TL[0]7330," the same number on the handgun police removed from Appellant's home). The trial court admitted into evidence a receipt that Banks generated for the sale of the Taurus G2C firearm and ammunition. ***Id.*** at 152.

PSP Sergeant Jeremy Carroll (Sergeant Carroll) testified he was part of a team that executed a search warrant at Appellant's home on December 19, 2018. ***Id.*** at 203-04. On a nightstand next to Appellant's bed, Sergeant Carroll found "a box that a Taurus handgun would come in," ***id.*** at 206, as well as "the paperwork from purchasing the handgun that came in that box." ***Id.*** at 207. Sergeant Carroll also found numerous "spent shell casings" in the breezeway outside of Appellant's home and in a barn. ***Id.*** at 207-09. On cross-examination, Sergeant Carroll described the methods he used to collect, process, and inventory the evidence. ***Id.*** at 212-14, 220-22; ***see also id.*** at 214 (trial court overruling the Commonwealth's objection to the relevance of this testimony).

PSP Sergeant Joseph Gober (Sergeant Gober) testified for the Commonwealth as an expert in the area of firearm and tool mark examination, without objection. N.T., 3/22/22, at 162. Sergeant Gober examined the discharged bullet (the bullet) that police found in the victim's bedroom, 40 spent bullet shell casings, and the Taurus G2C firearm. *Id.* at 163. Regarding the discharged bullet, Sergeant Gober stated:

> The one thing I did notice … is that [the bullet] has this red coating on it …[;] from experience my [] thinking was that this was a … Syntech bullet, it's a polymer coating that's what gives it the red coating. … I also noticed from experience when doing other tests [] that these [bullets] are very difficult to identify back to a firearm [] because of this polymer coating[;] it does not always mark as another metal[-]jacketed bullet would mark, sometimes it doesn't pick up the individual characteristics we're looking for.

*Id.* at 169-70. Sergeant Gober performed "test fires" of the Taurus G2C firearm (manufactured by Federal Corporation (Federal)), using "ammunition that Federal would produce as a Syntech cartridge."[4] *Id.* at 164-65, 172. Sergeant Gober testified his microscopic analysis of the bullet produced,

> an inconclusive finding, meaning that the bullet itself had the same number of class characteristics as the [Taurus G2C] firearm from my test fires[,] but there wasn't enough individual characteristics for me to identify [the bullet] back to [the Taurus G2C] firearm so I left it as an inconclusive result in my report.

---

[4] The Commonwealth also presented testimony from Banks that on November 11, 2018, Appellant purchased from the gun store five boxes of ammunition, including one box of 50 "Federal Syntech Nine Millimeter" bullets. N.T., 3/21/22, at 163. Banks described this particular ammunition as unique because "[t]he bullet has a red coating." *Id.* at 165; *see also id.* at 164, 165 (Banks confirming that this ammunition was "an unusual type of ammunition for [the gun store] to sell" and it was not "a good seller[.]").

*Id.* at 172-73; *but see also id.* at 182 (Sergeant Gober stating: "I was unable to eliminate [the bullet] from being discharged from this [Taurus G2C] firearm….").

Importantly, Sergeant Gober testified as follows with respect to his analysis of the single "nine millimeter discharged Federal cartridge case" that police found at the murder scene:

> My examination showed that … [the] cartridge[] case was discharged within this Taurus G2C firearm.
>
> * * *
>
> [] It's marked on the shell casing as FC which stands for Federal Corporation.

*Id.* at 175. Finally, with respect to the spent cartridge cases police found outside Appellant's home, Sergeant Gober stated his investigation revealed that "all thirty-nine discharged cartridge cases were discharged within this Taurus G2C firearm." *Id.* at 177.

PSP Lieutenant Laura Klinger (Lieutenant Klinger) testified as an expert in the field of latent fingerprint examination, without objection. *Id.* at 110. Lieutenant Klinger analyzed the Taurus G2C firearm, the empty magazine police found with the firearm, and a spent shell casing. *Id.* at 116. Lieutenant Klinger identified a "latent fingerprint" on the magazine, which came from Appellant's "right ring finger." *Id.* at 117. Lieutentant Klinger's analysis did not reveal any fingerprints on the remaining items. *Id.* at 121.

The Commonwealth also presented testimony from Brittni Andaloro (Andaloro), an undisputed expert in forensic DNA analysis. *Id.* at 137. Andaloro stated her analysis of the Taurus G2C firearm revealed that it had Appellant's DNA on the trigger and slide. *Id.* at 142-43.

Finally, Cody Hamm (Hamm) testified for the Commonwealth that he had been incarcerated with Appellant at the Wayne County prison in February 2019. *Id.* at 221. According to Hamm, he and Appellant had "[m]ultiple conversations" about the murder of the victim. *Id.* at 223. Hamm testified Appellant admitted:

> [The victim] owed [Appellant] over a thousand dollars' worth of money for pills, he went to her house and she was supposed to give him some pills to substitute for the money so they went back to [the victim's] room, when she reached over from sitting on the bed to grab the pills[, Appellant] shot her in the back of the head[;] the bullet went into the floor and the shell casing went behind a tall dresser that [Appellant] was unable to move.

*Id.*; *see also id.* (Hamm confirming that Appellant had discussed the murder "multiple times"). Hamm further testified that after the murder, Appellant claimed he traveled

> down a dirt road and throughout [*sic*] the rest of the shell casings from the gun. [Appellant a]lso took a pair of [] cowboy boots and his clothes that he wore [to the victim's home] that night and burned them.

*Id.* at 224. On cross-examination, the defense inquired about Hamm's criminal history, and whether Hamm had a motive to falsely implicate Appellant. *Id.* at 234-38.

The Commonwealth charged Appellant with homicide in February 2019. The matter proceeded to a jury trial in September 2021. The Commonwealth presented testimony from numerous witnesses, including PSP Corporal Brian Rickard (Corporal Rickard).[5] *See* N.T., 9/14/21, at 107-22.

Corporal Rickard testified he was assigned to perform an online investigation, in connection with the victim's murder, and he "conducted a search of Facebook for [Appellant]" on the suspected date of the murder, December 19, 2018. *Id.* at 109, 110. Corporal Rickard's investigation produced a post authored and uploaded by Appellant, dated October 17, 2018 (the Facebook post), which stated:

> So I added another gun to my collection today thank you Rich Banks I love the gun, shoots great and thank you Alexa Sampson for not putting me in the dog house and letting me buy it….

*Id.* at 110-11. Corporal Rickard explained that attached to the Facebook post was a photograph "of a black handgun and a loaded magazine next to it with some text." *Id.* Corporal Rickard further stated that he recognized the handgun in the photograph, as he had seen the Taurus G2C firearm later in the police investigation:

---

[5] It is undisputed that after trial, the police charged Corporal Rickard with crimes related to his theft of narcotics from the evidence room at the PSP Honesdale barracks in November 2021. *See* Commonwealth Brief at 9; Appellant's Brief at 14 (claiming the "basis for the charges against [] Corporal Rickard was that he gained access to and tampered with evidence from criminal cases. The evidence room was the same [] room where all of the … trial evidence against Appellant was located." (citations omitted)).

I believe [the Taurus G2C firearm] was seized on [] December 19th o[r] 20th by [Sergeant] Kistle at the time, I believe it was a black Taurus handgun the same as in this picture.

*Id.* at 111.

Corporal Rickard further testified at the first trial that he viewed Appellant's Facebook profile a second time on December 20, 2018. *Id.* at 111-12. He stated that Appellant's Facebook profile at that time displayed "the same text that I read earlier but without the picture of the gun and the magazine." *Id.* at 112. Finally, Corporal Rickard responded in the affirmative that he "receive[d] a number of items of evidence that were related to the investigation," and stated the evidence was "packaged and sealed and stored in the property room." *Id.* at 113. Appellant's first trial resulted in a hung jury and the declaration of a mistrial.

The trial court summarized what transpired thereafter, prior to re-trial:

On February 7, 2022, [Appellant], by and through his counsel[,] Paul J. Walker, Esq. [(Attorney Walker)], filed an omnibus pre-trial motion [(OPTM)] moving for [the trial] court to: (1) hold an evidentiary hearing on [Corporal] … Rickard's handling of the evidence in [Appellant's] case[, OPTM, 2/7/22, ¶¶ 9-13]; (2) suppress evidence handled and supervised by Corporal Rickard[, *id.* ¶¶ 14-20]; and (3) dismiss the charges against [Appellant. *Id.* ¶ 21-26.][1] [The Commonwealth filed a response on February 14, 2022.] After argument on February 16, 2022, [the trial] court denied … [the OPTM. The] court also denied the oral motion of Attorney Walker requesting th[e] court to conduct an *in camera* review of Corporal Rickard's medical records.

[1] Prior to his arrest and suspension from the [PSP] … in November 2021, Corporal Rickard was the evidence room custodian at the PSP Honesdale Barracks. Although not specified in [Appellant's OPTM], it was stated on the record during oral argument on February

16, 2022[,] that the specific evidence at issue [was]
shell casings recovered from the scene of the crime and
from [Appellant's home]….

On February 23, 2022, the Commonwealth filed a motion *in
limine* [(Motion *in Limine*)] requesting that [the trial] court
preclude reference to the arrest of Corporal Rickard and the
alleged underlying criminal conduct in opening statement and/or
questioning of witnesses. [***See*** Motion *in Limine*, 2/23/22, at 3
(claiming any evidence pertaining to the charges against Corporal
Rickard was "simply not relevant," and stating, "the
Commonwealth will not be calling [Corporal] Rickard to testify at
trial[,] as his involvement in the case was very limited and the
information he shared with the jury during the first trial can be
supplied through the first-hand knowledge of other
investigators.").] After argument on March 1, 2022, [the trial]
court granted [the Motion *in Limine*]. In its March 3, 2022 order,
[the trial] court noted: "[Appellant] has failed to show sufficient
probative value of a reference to the arrest of [Corporal] Rickard
and his alleged underlying criminal conduct. The mere fact that
the [] charge against [Corporal] Rickard happened does not
suggest that the chain of custody in this case has been tainted.
No evidence has been presented that there was any tampering
with or tainting of the chain of custody in this case." [Order,
3/3/22, n.1.]

Trial Court Opinion, 9/6/22, at 1-2 (footnote in original; some capitalization

modified).

Appellant's jury retrial commenced on March 21, 2022. Corporal Rickard

did not testify.[6] Three days later, the jury found Appellant guilty of first-

_____

[6] During direct examination of Sampson, Attorney Walker objected at sidebar
with respect to the prosecution asking Sampson about the Facebook post:

This is about a Facebook post and the person who downloaded the
Facebook post…. [The prosecution is] going to suggest that this was
downloaded, that it existed on [Appellant's] Facebook [account]….

*(Footnote Continued Next Page)*

degree murder. On June 9, 2022, the trial court sentenced Appellant to life in prison.

Appellant timely filed a post-trial motion, claiming, *inter alia*, he was entitled to a new trial because the Commonwealth failed to present sufficient evidence to support the conviction. Post-trial Motion, 6/20/22, ¶ 23. Appellant further argued,

> at the time of jury trial …, the [trial] court committed error and abused its discretion in precluding the defense from raising the inquiry regarding the improprieties and criminal conduct of [Corporal] Rickard, and in not allowing the defense to cross examine investigating and prosecuting team members regarding the improper and illegal conduct of [Corporal] Rickard.

*Id.* ¶ 22 (some capitalization modified); *see also id.* ¶ 21 (complaining the trial court "prevented [Appellant] from adequately defending himself at [t]rial

---

> But this is all [Corporal] Rickard and that's the problem[; the prosecution is] trying to get [this evidence] in through the back door.

N.T., 3/22/22, at 13. The prosecutor responded:

> That's simply not true. At this point I'm not dealing with the [] exhibit [Attorney Walker is] talking about. I expect [Sampson] to indicate that she's familiar with [the Facebook post,] that she saw it that night[,] and I'll simply ask her if she recognizes this.

*Id.* at 14. The trial court overruled the defense's objection. *Id.* (stating, "I think [Sampson] can testify as to whether or not she herself had Facebook … [and] if she saw a similar post…."); *but see also id.* (trial court stating "if we get into who downloaded" the Facebook post, "then we have a problem"). Sampson thereafter responded in the affirmative that she viewed the Facebook post "in October of 2018 when that was posted on Facebook[.]" *Id.*; *see also id.* at 15 (Sampson reading aloud the content of the Facebook post).

and precluded him from explaining and establishing possible theories of defense").

The trial court denied Appellant's post-trial motion by an order filed on June 23, 2022 (PTM Order). Appellant timely filed an appeal,[7] followed by a court-ordered Pa.R.A.P. 1925(b) concise statement of errors on appeal (Concise Statement).

Appellant presents three issues for review:

I.   Was the evidence presented at trial sufficient for a finding of guilt against Appellant when there were no witnesses to the crime?

II.  Did the Trial Court deprive the Appellant the right to a fair trial when it precluded Appellant from introducing potentially exculpatory evidence, as well as, impeachment evidence regarding PSP Corporal Brian Rickard's professional misconduct and criminal charges?

III. Did the Trial Court deny Appellant his right to confront witnesses against him when it precluded PSP Corporal Brian Rickard being called as a witness?

Appellant's Brief at 8 (renumbered for disposition).

Before addressing Appellant's issues, we note that his 27-paragraph Concise Statement is overly lengthy and non-compliant with our Rules. *See* Pa.R.A.P. 1925(b)(4)(iv) ("non-redundant, non-frivolous issues [must be] set

---

[7] Appellant stated in the notice of appeal that he appealed the PTM Order. However, in a criminal action, an "appeal properly lies from the judgment of sentence made final by the denial of post-sentence motions." *Commonwealth v. Jackson*, 283 A.3d 814, 816 n.1 (Pa. Super. 2022) (citation omitted).

forth in an appropriately concise manner"). We have stated, "When an appellant fails adequately to identify in a concise manner the issues sought to be pursued on appeal, the trial court is impeded in its preparation of a legal analysis which is pertinent to those issues." *Commonwealth v. Ray*, 134 A.3d 1109, 1114 (Pa. Super. 2016) (citation omitted)). We have emphasized Rule 1925(b) "is a crucial component of the appellate process because it allows the trial court to identify and focus on those issues the parties plan to raise on appeal." *Commonwealth v. Bonnett*, 239 A.3d 1096, 1106 (Pa. Super. 2020). Instantly, the issues Appellant raised in his statement of questions vary from the Concise Statement. *Compare* Appellant's Brief at 8, *with* Concise Statement, 8/15/22; *see also Bonnett*, 239 A.3d at 1106 ("any issue not raised in a Rule 1925(b) statement will be deemed waived for appellate review.); Pa.R.A.P. 302(a) (issues cannot be raised for the first time on appeal). Despite these defects, we address Appellant's issues to the best of our ability.

Appellant first claims his murder conviction cannot stand, where the Commonwealth failed to present sufficient evidence of his identity as the perpetrator.[8] *See* Appellant's Brief at 31-32. According to Appellant, "there were no witnesses to the death of the victim. The only evidence tying []

---

[8] The trial court did not address this claim in its Pa.R.A.P. 1925(a) opinion, hampering our review.

Appellant to the murder … was circumstantial evidence." *Id.* at 32; *see also*

*id.* (claiming, "the physical evidence offered … was questionable.").

We apply the following standard of review:

When reviewing a sufficiency of the evidence claim, this Court must view the evidence and all reasonable inferences to be drawn from the evidence in the light most favorable to the Commonwealth as verdict winner, and we must determine if the evidence, thus viewed, is sufficient to prove guilt beyond a reasonable doubt. This Court may not substitute its judgment for that of the factfinder. If the record contains support for the verdict, it may not be disturbed. Moreover, a jury may believe all, some or none of a party's testimony.

*Commonwealth v. Burns*, 765 A.2d 1144, 1148 (Pa. Super. 2020) (citations

omitted). "The Commonwealth may sustain its burden by means of wholly

circumstantial evidence…." *Commonwealth v. Brown*, 48 A.3d 426, 430

(Pa. Super. 2012).

The Crimes Code provides a "criminal homicide constitutes murder of

the first degree when it is committed by an intentional killing." 18 Pa.C.S.A.

§ 2502(a). "In addition to proving the statutory elements of the crimes

charged beyond a reasonable doubt, the Commonwealth must also establish

the identity of the defendant as the perpetrator of the crimes."

*Commonwealth v. Smyser*, 195 A.3d 912, 915 (Pa. Super. 2018) (citation

omitted); *see also Commonwealth v. Orr*, 38 A.3d 868, 874 (Pa. Super.

2011) (*en banc*) ("Evidence of identi[ty] need not be positive and certain to

sustain a conviction." (brackets and citation omitted)).

Contrary to Appellant, the Commonwealth counters:

The circumstantial evidence presented by the Commonwealth established [Appellant's] guilt beyond a reasonable doubt. [Appellant] and [the victim] had a close relationship where they regularly exchanged money and drugs. They were not strangers. This was not a random encounter. [Appellant] was the last person to communicate with [the victim] prior to her murder. There was absolutely no doubt that the murder weapon was bought for [Appellant] by his girlfriend[, Sampson, and Appellant] even posted a picture of it on Facebook. His fingerprint was found on the magazine and his DNA was identified on the [Taurus G2C firearm] grip trigger and slide of the handgun. The spent shell casing found at the [murder] scene was discharged from this gun and [Appellant] was tied to the unique[,] red-tipped bullet that was fired from the gun.

Following the murder, [Appellant] suddenly needed to go shopping in Scranton and bought a new shirt. And then there were the lies that [Appellant] told police regarding his relationship with [the victim] and his knowledge of the handgun, and how he attempted to place the blame on Sampson at one point. … Finally, there was [Appellant's jailhouse] confession to Hamm. All of this evidence taken together clearly supported the first-degree murder conviction. There was nothing "questionable" at all about the bullet, bullet casings and the Taurus [G2C firearm] that would justify any conclusion that [Appellant] was not responsible for the murder.

Commonwealth's Brief at 30-31. We agree.

We thoroughly detailed above the evidence of Appellant's guilt presented at his retrial. This included, *inter alia*, testimony from the following witnesses:

- Cone: In the weeks before the murder, he witnessed Appellant confront the victim at her home, in a "[v]ery agitated" state, after which Appellant "pulled [a handgun] out, was waving it around, and [] he ejected the bullet" onto the ground. **See** N.T., 3/22/22, at 211-12;

- Cone: The ejected bullet he saw was "a red tip bullet." **Id.** at 212;

- Sampson: Appellant had a close relationship with the victim, obtained medication from the victim, and would abuse pain/sleeping medication. *Id.* at 10;

- Sampson: Although she completed the paperwork at the gun store in October 2018 to purchase the Taurus G2C firearm, Appellant paid for, used, and occasionally carried the gun. *Id.* at 12, 16-17;

- Sampson: She found it "weird" that Appellant told her on December 19, 2018, that he was driving a long distance, with their child, to shop in Scranton, especially in light of Appellant's disability and lack of a driver's license. *Id.* at 22-23;

- Sampson: Once Appellant learned Sampson had relinquished the Taurus G2C firearm to police, Appellant expressed frustration with her. *Id.* at 26;

- Banks: Shortly after Appellant and Sampson purchased the Taurus G2C firearm, Appellant returned to the gun store to buy, *inter alia*, "Federal Syntech Nine Millimeter" ammunition. This ammunition was unique and unlike other ammunition because the bullets have "a red coating." N.T., 3/21/22, at 163, 165; *see also id.* at 164-65 (Banks testifying the gun store rarely sold this particular ammunition);

- **Sergeant Gober: His microscopic analysis of the spent bullet shell case that police found at the murder scene revealed it "was discharged within th[e] Taurus G2C firearm."** N.T., 3/22/22, at 175 (emphasis added);

- Sergeant Gober: Although his microscopic analysis of the bullet found in the victim's bedroom was "inconclusive," the bullet had a unique polymer coating that "does not always mark as another metal[-]jacketed bullet would mark." *Id.* at 169-70, 172-73;

- Andaloro: Her forensic analysis of the Taurus G2C firearm revealed Appellant's DNA on it. *Id.* at 142-43;

- Lieutenant Klinger: Her forensic analysis of the magazine that police found with the Taurus G2C firearm revealed Appellant's fingerprint. *Id.* at 116-17;

- **Hamm: Appellant confessed to perpetrating the murder and thereafter burning evidence.** *Id.* at 223-24; and

- Appellant's conflicting statements given to police when they interviewed him shortly after the murder. *See generally* Commonwealth Exhibits 63-65 (explained *supra*).

Appellant correctly concedes that "circumstantial evidence can itself be sufficient to prove any element or all of the elements of criminal homicide." Appellant's Brief at 32 (quoting *Commonwealth v. Chamberlain*, 30 A.3d 381, 394 (Pa. 2011)). Indeed, the Commonwealth presented ample circumstantial and physical evidence for the jury to find beyond a reasonable doubt that Appellant was the perpetrator. The record undermines Appellant's undeveloped claim[9] to the contrary. Accordingly, there is no merit to Appellant's first issue challenging the sufficiency of the evidence.

Appellant next argues the trial court improperly denied his OPTM and precluded "reference to exculpatory and impeachment evidence" in the form of evidence of Corporal Rickard's arrest. Appellant's Brief at 19 (capitalization omitted). According to Appellant, the trial court,

---

[9] Appellant's sufficiency claim consists of less than one page of argument and contains insufficient citation to authority. Appellant's Brief at 31-32. It is settled that "[t]his Court will not act as counsel and will not develop arguments on behalf of an appellant." *Commonwealth v. Kane*, 10 A.3d 327, 331 (Pa. Super. 2010) (citation omitted); *see also* Pa.R.A.P. 2119(a) (mandating that appellants develop arguments with citation to and analysis of relevant legal authority). Further, where, as here, "the transcripts … are voluminous, [] it is not the responsibility of this Court to scour the record" to find support for an appellant's claims. *Commonwealth v. Baker*, 963 A.2d 495, 502 n.6 (Pa. Super. 2008).

deprived the Appellant any opportunity to evaluate and use the misconduct of [] Corporal [] Rickard and the corresponding criminal charges as either exculpatory or impeachment evidence. The trial court held no evidentiary hearing….

The trial court deprived the Appellant from even determining if [] Corporal Rickard's misconduct was relevant to his case.

*Id.* at 24 (some capitalization modified); *see also id.* at 24-25 ("Corporal Rickard was the custodian of … physical evidence [related to Appellant's case;] it logically tends to follow that his involvement in Appellant's case was very relevant."). Appellant further claims: "Physical evidence was crucial to the Commonwealth's case. … Appellant had a genuine and tangible reason to question [] Corporal Rickard's involvement in and handling of the evidence in question." *Id.* at 25.

The Commonwealth counters the trial court properly denied Appellant's OPTM requesting an evidentiary hearing and the suppression of evidence. *See* Commonwealth Brief at 31-35. According to the Commonwealth:

By attempting to elevate [Corporal] Rickard's involvement and heighten the importance of his testimony, [Appellant] is trying to paint the trial court's ruling as particularly egregious and violative of his due process rights. However, characterizing [Corporal] Rickard as a central figure could not be further from the truth. [Corporal] Rickard's role in [Appellant's] first trial was to explain his observations of [Appellant's] posts on Facebook. [Corporal] Rickard's direct and cross-examination spanned a mere 15 pages of the transcript. That he happened to also be the evidence custodian at the time of [the victim's] murder was merely an observation of fact. … [Corporal] Rickard's testimony was not even necessary as part of the Commonwealth's case-in-chief at the second trial. To the extent that [Appellant] is complaining that he was prevented from calling [Corporal] Rickard at the re-trial, there is no evidence of this in the record. At the end of the

- 23 -

day, [Appellant's] complaint about access to [Corporal] Rickard is hyperbolic.

*Id.* at 32-33 (breaks omitted).

The Commonwealth claims that if police had arrested Corporal Rickard **before** Appellant's first trial in 2021, "there may have been unanswered questions at that time as to how his alleged criminal conduct may have factored into the preservation of evidence in [Appellant's] case. But that was not the case at the time of the second trial." *Id.* at 35.

> [O]ur standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

*Commonwealth v. Yandamuri*, 159 A.3d 503, 516 (Pa. 2017) (citations omitted).

This Court has explained the relevant law:

[T]he Fourteenth Amendment's Due Process Clause[:]

> [R]equires defendants be provided access to certain kinds of evidence prior to trial, so they may "be afforded a meaningful opportunity to present a complete defense." This guarantee of access to evidence requires the prosecution to turn over, if requested, any evidence which is exculpatory and material to guilt or punishment, *see Brady [v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963),] and to turn over exculpatory

evidence which might raise a reasonable doubt about a defendant's guilt, even if the defense fails to request it, *see United States v. Agurs*, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). If a defendant asserts a *Brady* or *Agurs* violation, he is not required to show bad faith.

There is another category of constitutionally guaranteed access to evidence, which involves evidence that is not materially exculpatory, but is potentially useful, that is destroyed by the state before the defense has an opportunity to examine it. When the state fails to preserve evidence that is "potentially useful," there is no federal due process violation "unless a criminal defendant can show bad faith on the part of the police." Potentially useful evidence is that of which "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." In evaluating a claim that the Commonwealth's failure to preserve evidence violated a criminal defendant's federal due process rights, a court must first determine whether the missing evidence is materially exculpatory or potentially useful.

*Commonwealth v. Williams*, 154 A.3d 336, 339 (Pa. Super. 2017) (quoting *Commonwealth v. Chamberlain*, 30 A.3d 381, 402 (Pa. 2011) (some citations omitted)).

* * *

Exculpatory evidence is "evidence which extrinsically tends to establish [a] defendant's innocence of the crimes charged." *Commonwealth v. Woodell*, 496 A.2d 1210, 1212 (Pa. 1985) (internal quotation marks omitted). A claim that a defendant was denied access to exculpatory evidence must be supported; "it cannot be based on a mere assertion." *Commonwealth v. Snyder*, A.2d 396, 405 (Pa. 2009) (internal quotation marks omitted).

*Commonwealth v. Ward*, 188 A.3d 1301, 1308-09 (Pa. Super. 2018)

(citations modified).

Before addressing Appellant's claim, we observe the Pennsylvania Rules of Criminal Procedure require suppression motions to "state **specifically and with particularity** the evidence sought to be suppressed, the grounds for suppression, and the facts and events in support thereof." Pa.R.Crim.P. 581(D) (emphasis added). "In the extreme case, a complete failure to comply with the specificity requirements of Rule 581(D) will result in waiver, as those requirements have been held to be mandatory." *Commonwealth v. Young*, 287 A.3d 907, 916 (Pa. Super. 2022) (citation omitted). Instantly, Appellant's OPTM did not state with particularity the evidence he wanted the court to suppress. *See* OPTM, 2/7/22, ¶ 19 (claiming Corporal Rickard's "criminal conduct calls into question all of the evidence he handled the in [Appellant's] case as well as any of the evidence held in [Appellant's] case that C[orporal] Rickard was to supervise."). Nevertheless, we will not find waiver, as this is not an "extreme case." *Dixon*, *supra*.

The trial court opined it did not err in denying Appellant's OPTM and suppression request:

> At the February 16, 2022 argument [on the OPTM], counsel for the Commonwealth … argued that the extent of Corporal Rickard's handling of the shell casings [that police found at the murder scene and Appellant's home] was to receive them at the barracks and to place them into storage within the evidence room. The record showed that Corporal Rickard was listed as the receiving officer of the evidence in this case; but that other officers (*i.e.*, the submitting officers) collected and bagged the evidence during the investigation. This was also established through testimony of the submitting officers at [Appellant's] September 2021 trial.[3] This court, therefore, was satisfied that the shell casings were properly seized and that the Commonwealth met its burden.

3 Trooper [] Hitchcock of the PSP Dunmore Barracks testified [at Appellant's retrial] that he collected and packaged the shell casing [he found] at the scene of the crime [] near the victim's body, which was then delivered to PSP Honesdale. [*See* N.T., 3/21/22, at 87, 89, 112-14, 127-30 (discussed above).] Sergeant [] Carroll of the PSP Dunmore Barracks authenticated and accounted for all the shell casings he collected at [Appellant's home] as property records[,] prepared and packaged by him and signed off by Corporal Rickard at PSP Honesdale. [*See id.* at 212-14, 220-22.]

[Further, Appellant] moved for the dismissal of charges against him due to the possibility of tainted evidence in the case. [Appellant] averred that failure to dismiss the charges would be a denial of [Appellant's] due process rights. Because this court denied [Appellant's] motion for an evidentiary hearing and motion to suppress, denial of [Appellant's] motion to dismiss the charges was warranted. **There was no evidence that the shell casings were tainted throughout the chain of custody; therefore, there was no due process violation.**

Trial Court Opinion, 9/6/22, at 4 (emphasis added; footnote in original; some capitalization modified).

Our review discloses the trial court's rationale is supported by the record and the law. *See id.* Contrary to Appellant's claim, the court did not abuse its discretion in denying the OPTM. Appellant's second issue does not merit relief.

In his final issue, Appellant claims the trial court erred in granting the Commonwealth's Motion *in Limine*, and violated his constitutional right to confront adverse witnesses, namely, Corporal Rickard. *See* Appellant's Brief at 26-31. According to Appellant, "Corporal Rickard was a … participant in the prosecution. The Appellant had the right to confront [] Corporal Rickard and

question him on the investigation and handling of crucial evidence." *Id.* at 28-29; *but see also id.* at 29 (Appellant conceding, "Corporal Rickard did not testify as a witness in the second trial.").

When reviewing a trial court's ruling on a motion *in limine*, we apply an abuse of discretion standard of review. *Commonwealth v. Mangel*, 181 A.3d 1154, 1158 (Pa. Super. 2018); *see also Commonwealth v. Jackson*, 283 A.3d 814, 817 (Pa. Super. 2022) ("When we review a trial court's ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law." (citation omitted)). "An abuse of discretion will not be found based on a mere error of judgment, but rather exists where the court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." *Commonwealth v. Harrington*, 262 A.3d 639, 646 (Pa. Super. 2021) (citation omitted).

This Court has explained:

"The threshold inquiry with admission of evidence is whether evidence is relevant." *Commonwealth v. Collins*, 888 A.2d 564, 577 (Pa. Super. 2005). Evidence is relevant if "it has the tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Pa.R.E. 401(a)-(b). "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable[,] or supports a reasonable inference or presumption regarding a material fact." *Commonwealth v. Drumheller*, 808 A.2d 893, 904 (Pa. Super.

- 28 -

2002). "All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402.

*Jackson*, 283 A.3d at 817-18 (some citations modified).

The Commonwealth claims the court properly granted the Motion *in Limine*:

> [T]he point of the Commonwealth's [M]otion *in Limine* [was] to eliminate any improper [defense] questioning, musings or commentary about [Corporal] Rickard's arrest and what impact it could possibly have on [Appellant's] case. The intended defense argument amounts to nothing more than speculation about supposed exculpatory evidence that does not exist. First, that [Corporal] Rickard would be arrested for stealing heroin from the [PSP Honesdale] evidence room and taking steps to cover up his activity almost three years after the investigation into [the victim's] murder has absolutely no bearing or relevance to [Appellant's] case whatsoever. The evidence was simply not relevant. … Indeed, the extent of [Corporal Rickard's] handling of this evidence simply consisted of receiving packaged evidence that another PSP trooper had collected. There was no issue with respect to the integrity of this evidence, nor its chain of custody, and it was properly admitted into [Appellant's] first trial without any issue or concern. As such, [Corporal] Rickard's criminal charges -- which were still pending at the time of [Appellant's] second trial – were therefore wholly collateral to the issue of [Appellant's] guilt.

Commonwealth Brief at 38-39. We agree.

The trial court cogently explained its rejection of Appellant's claim:

> With regards to the Motion *in Limine* filed by the Commonwealth on February 23, 2022, this court provided its reasoning for granting the motion in its March 3, 2022 Order[, discussed ***supra***]. The Order was issued upon consideration of the motion, [and Appellant's] response thereto and after oral argument. In its Motion, the Commonwealth argued that the evidence of Corporal Rickard's arrest and alleged underlying criminal conduct is not relevant. The Commonw[e]alth cited applicable caselaw and stated: "Here, there is no nexus between

> [Corporal] Rickard's theft of heroin from the evidence room and his handling of the spent shell casings in [Appellant's] case. Indeed, the extent of his handling of this evidence simply consisted of receiving packaged evidence that other PSP troopers had collected. **There is no issue with respect to the integrity of this evidence, nor its chain of custody, and it was properly admitted into [Appellant's] first trial and remains in the control of the Court.**" [Motion *in Limine*, 2/23/22, at 4 (footnote omitted).] **This court agreed** and precluded reference to Corporal Rickard's arrest and alleged underlying criminal conduct in opening statement and questioning of witnesses in the March 2022 trial. The evidence was not relevant and, therefore, was properly precluded.

Trial Court Opinion, 9/6/22, at 4-5 (emphasis added; footnote omitted; some capitalization modified).

As we discern no abuse of the trial court's discretion in denying the Commonwealth's Motion *in Limine*, and conclude Appellant's proposed evidence with respect to Corporal Rickard was irrelevant, we affirm on this basis. ***See id.*** Appellant's final issue does not merit relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/23/2023