2018 PA Super 142

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANTOINE WARD | : | |
| | : | |
| Appellant | : | No. 968 WDA 2016 |

Appeal from the Judgment of Sentence February 24, 2016
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0001839-2014

BEFORE:  BOWES, J., STABILE, J., and FORD ELLIOTT, P.J.E.

OPINION BY BOWES, J.:                                    **FILED JUNE 1, 2018**

Antoine Ward appeals from the judgment of sentence of life imprisonment entered after he was convicted of first-degree murder, third-degree murder, and carrying a firearm without a license.  We affirm.

On a snowy evening in January 2014, in the Mt. Oliver neighborhood of Pittsburgh, Ja'yde Dorsey heard gunshots and looked out a window to see a silver Lexus that appeared to be stopped at a stop sign.  When she went outside to inquire if anyone was injured, there were four more shots and she saw sparks in the back of the car.   Ms. Dorsey called 911, and paramedics arrived within minutes to find Jason Eubanks and Cherylann Sabatasso dead in the car.  N.T. Trial, 10/15-19/15, at 52-54, 70.  Tracks in the snow led from the car to 302 Rochelle Street, where Appellant lived with Nichelle Goodnight. *Id*. at 78, 90, 237-41, 284.

Appellant was charged with two counts of homicide and firearms violations. A jury convicted Appellant of the crimes listed above, and the trial court imposed consecutive sentences of life imprisonment on the murder convictions, followed by two to four years incarceration for carrying a firearm without a license. Following the denial of his post-sentence motion, Appellant timely filed a notice of appeal. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant presents the following issues for this Court's review, which we have paraphrased to omit unnecessary detail.[1]

> I.     Did the Commonwealth offer insufficient evidence to prove beyond a reasonable doubt that Appellant acted in self-defense?
>
> II.     Did the trial court err in not excluding evidence obtained from the silver Lexus when the vehicle was transferred out of the country before it was examined by Appellant's investigators?
>
> III.     Did the trial court err in allowing the Commonwealth's medical expert to testify outside of both the scope of his report and his area of expertise?

Appellant's brief at 7.

We first consider Appellant's claim that the Commonwealth offered insufficient evidence that he did not act in self-defense. "The use of force against a person is justified when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use

---

[1] *See* Pa.R.A.P. 2116(a) ("The statement of the questions involved must state concisely the issues to be resolved, expressed in the terms and circumstances of the case but without unnecessary detail.").

of unlawful force by the other person." ***Commonwealth v. Emler***, 903 A.2d 1273, 1279 (Pa.Super. 2006) (citation and quotation marks omitted). When a defendant raises a claim of self-defense by identifying evidence that supports the claim, the Commonwealth has the burden of disproving self-defense beyond a reasonable doubt. ***Commonwealth v. Bullock***, 948 A.2d 818, 824 (Pa.Super. 2008). "[T]he Commonwealth cannot sustain its burden of proof solely on the fact finder's disbelief of the defendant's testimony." ***Commonwealth v. Torres***, 766 A.2d 342, 345 (Pa. 2001).

Appellant testified at trial in support of his claim of self-defense. He said he wanted to meet Mr. Eubanks on the night in question to obtain cocaine. N.T. Trial, 10/20-22/15, at 700. He called Mr. Eubanks to make the arrangements, and Mr. Eubanks said he would be at Appellant's house in a minute. ***Id***. Mr. Eubanks arrived in a car that was being driven by Ms. Sabatasso, and Appellant took a seat in the back of the vehicle. ***Id***. They then drove to the home of Appellant's mother so Appellant could obtain his tax papers to offer Mr. Eubanks as proof that Appellant would soon have money to pay for the cocaine. ***Id***. at 702. While Ms. Sabatasso drove, she and Appellant argued about his accusation, conveyed to Mr. Eubanks the previous day, that Ms. Sabatasso had sought to cheat on Mr. Eubanks with another man. Mr. Eubanks encouraged them to calm down. ***Id***. at 708-09. After Appellant questioned Mr. Eubanks's manhood, Mr. Eubanks pulled a gun on Appellant, and the two men struggled for the weapon. Ms. Sabatasso was

shot in the head when she stopped the car abruptly. *Id*. at 710. Appellant claimed that he shot Mr. Eubanks during a subsequent struggle for the gun, and shot him a second time, in the face, after Mr. Eubanks climbed into the back seat and the two men again attempted to gain control of the weapon. *Id*. at 711-12. Appellant ran home, placed the bullets from the gun into a sock, put his bloody clothing in a plastic bag, and hid the gun under a kitchen cabinet. *Id*. at 713-14.

Based upon the above testimony, self-defense was properly at issue in the case. Therefore, the Commonwealth was required to disprove the defense. *Bullock*, *supra*. Appellant contends that it failed to do so. Appellant's brief at 32-39. We disagree.

It is settled that "[t]he fabrication of false and contradictory statements by an accused [is] evidence from which a jury may infer that they were made with an intent to mislead the police or other authorities, or to establish an alibi or innocence, and hence are indicatory of guilt." *Commonwealth v. Carbone*, 574 A.2d 584, 589 (Pa. 1990) (internal quotation marks and citation omitted). For example, in *Carbone*, the defendant claimed that she stabbed the decedent when he had attempted to rape and kill her. *Id*. at 588. Although the Commonwealth offered no contradictory witnesses to the stabbing, the jury convicted Carbone of first-degree murder. Carbone appealed, raising the same claim as Appellant in the instant case: that the

Commonwealth did not disprove self-defense beyond a reasonable doubt. ***Id***. at 589.

Our Supreme Court held that, viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, the jury could have concluded that Carbone was not justified in killing the decedent. Specifically, the Court pointed to the fact that Carbone initially lied to explain the blood on her clothing, claiming that she had punched a friend in the nose. ***Id***. at 590. Further, her claim that the decedent walked 100 feet back to his vehicle after she stabbed him was refuted by testimony that he would have been physically unable to do so after being stabbed in the back and heart. ***Id***. at 589.

In the instant case, Appellant offered multiple versions of his actions on the day of the shootings. In his initial statement to the police, Appellant indicated that Mr. Eubanks was supposed to come to Appellant's house on the day of the shooting, but that Mr. Eubanks never appeared. N.T. Trial, 10/15-19/15, at 277. Appellant also offered three different versions of how he got from his home on Rochelle Street to his mother's house: that he had walked, that he drove Goodnight's car there, and that he had driven a different, unidentified person's car there. ***Id***. at 279. Appellant first placed himself home alone at 302 Rochelle Street during the evening in question, including at the time Mr. Eubanks and Ms. Sabatasso were killed. ***Id***. at 279-80. Then he claimed that he called his friend to meet at a local bar to toast Mr. Eubanks. ***Id***. at 280. Appellant indicated that he learned of Mr. Eubanks's death

because Appellant was standing on the porch of 302 Rochelle Street when an unidentified person walked by and informed him that there were two people dead in a vehicle; Appellant figured it was Mr. Eubanks and Ms. Sabatasso based upon the description of the car. *Id*. at 281. Appellant initially denied having gone to the crime scene, but later contradicted that statement and said that he went to the corner after hearing a gunshot, and called Mr. Eubanks's phone upon seeing the Lexus in the middle of the intersection. *Id*.

Additionally, the Commonwealth offered evidence that a sock containing bullets and a plastic bag containing bloody clothing were recovered from a wooded area at the end of Appellant's street. *Id*. at 336. A pistol and magazine were retrieved from under a cabinet in the kitchen at 302 Rochelle Street. *Id*. at 393. The jury could conclude from Appellant's attempts to conceal or dispose of evidence of his involvement in the shootings constituted evidence of guilt. ***Commonwealth v. Paddy***, 800 A.2d 294, 319 (Pa. 2002) ("[A]ttempts by a defendant to suppress evidence are admissible to demonstrate his or her consciousness of guilt.").

Moreover, Appellant informed the jury that Mr. Eubanks was shot during an initial struggle for the gun, and then reached into the back seat of the car to struggle for the gun a second time, at which time Appellant shot him in the face. N.T. Trial, 10/20-22/15, at 711-12. However, the Commonwealth's medical expert testified that the first shot that hit Mr. Eubanks in his left ear fractured his skull and would either have killed him immediately, or allowed

for only minimal movement before fatality.  N.T. Trial, 10/15-19/15, at 562-63.  From this evidence the jury could have found that Mr. Eubanks would not have been physically able to have engaged in a second struggle for the gun after he was shot during the initial struggle.

Thus, the record reveals that the Commonwealth did not rely solely upon disbelief of Appellant's testimony to prove that Appellant did not act in self-defense.  From his false statements and attempts to hide the physical evidence, and Appellant's testimony that he shot Mr. Eubanks in the head, the jury was permitted to conclude that Appellant was guilty.  ***See Commonwealth v. Hinchcliffe***, 388 A.2d 1068, 1070-71 (Pa. 1978) (holding evidence was sufficient to support third-degree murder conviction where the only witness to the killing was Hinchcliffe, who claimed self-defense; in addition to being free to disbelieve some or all of Hinchcliffe's self-defense story, the jury could rely upon the facts that Hinchcliffe sought to dispose of the body and hide evidence of the killing).  Accordingly, Appellant's first issue merits no relief.

Appellant's remaining issues concern the trial court's evidentiary rulings. The following principles guide our review.

> The [a]dmission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion.  Accordingly, a ruling admitting evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.

*Commonwealth v. Shelton*, 170 A.3d 549, 552 (Pa.Super. 2017) (citations and quotation marks omitted).

With his first evidentiary issue, Appellant contends that the physical evidence obtained from the silver Lexus should have been suppressed.[2] The following background information summarized by the trial court is relevant to Appellant's claim.

> [T]he homicides occurred within Cheralynn Sabatasso's vehicle on January 23, 2014. The vehicle was secured on that date and towed to the police auto squad for processing. Extensive photographs were taken and evidence was collected from the vehicle both at the scene and at the auto squad. On February 8, 2014, the vehicle was transported to the police impound facility.
>
> On March 12, 2014, Appellant filed a formal motion for discovery, requesting inspection of and copies of reports pertaining to [. . .] physical evidence. The Commonwealth provided photographs and reports regarding the vehicle. These reports did not contain any opinions as to trajectory of bullets, but rather documented general observations of items discovered within the vehicle.
>
> On March 25, 2014, Detective McGee signed a Request for Chief's Release to return the vehicle to the Sabatasso family because the processing of the vehicle was complete and the family requested return of the vehicle. Assistant District Attorney Michael Berquist authorized the return and the vehicle was subsequently transported to the residence of [Ms.] Sabatasso's

---

[2] In stating his evidentiary issues in his brief, Appellant alternatively suggests that the trial court should have given cautionary instructions regarding the spoliation of evidence and unqualified expert testimony. Appellant's brief at 7, 40, 60. Appellant does not cite where in the record he made a request for cautionary instructions; nor have we found any such request in our review. Moreover, he does not offer any argument or cite any authority to support the claim that a cautionary instruction should have been given. Accordingly, the claims that the trial court erred in not issuing such instructions are waived. *Commonwealth v. Schoff*, 911 A.2d 147, 158 (Pa.Super. 2006).

mother. Shortly thereafter, [Ms.] Sabatasso's estate transferred ownership of the vehicle to the insurance company, and on May 5, 2014, the family requested that the vehicle be transported to Coparts, a local salvage yard. Pittsburgh police complied and the vehicle was transported to the salvage yard.

On May 13, 2014, Appellant's trial attorney Christopher Patarini, along with his investigators, met with Detective [James] McGee at Coparts to examine the vehicle. At that time, Appellant's investigators took more photographs of the vehicle at the direction of a potential defense expert, Fred Wentling, who was corresponding with the defense team via Skype. On May 13, 2014, Attorney Patarini called ADA Berquist to request that the vehicle be transferred back into police custody. ADA Berquist relayed this request to Detective McGee, who assigned this responsibility to Detective Sherwood.

At some point in time, because the insurance company now owned the vehicle, Detective McGee was told that a court order would be needed in order to transfer the vehicle back to police custody. ADA Berquist requested the necessary information from Detective Sherwood for the court order, but never received a response. A court order was never issued. ADA Berquist was under the impression that the police were taking care of re-securing the vehicle. In the meantime, Coparts assured Detective McGee that they would store the vehicle, covered, as long as the police needed; the vehicle remained at Coparts.

On May 23, 2014, [t]he Trial Court ordered discovery for scientific evidence to close on June 29, 2014, absent exigent circumstances. On July 2, 2014, Appellant filed a Supplemental Motion for Specified Discovery, requesting opinion evidence and scientific reports.

On November 25, 2014, the insurance company sold the vehicle and it was transported to the United Arab Emirates. Coparts did not notify the police, the Commonwealth, or Appellant that the vehicle had been sold and transported abroad.

On March 25, 2015, the Commonwealth's expert, Detective Blase Kraeer, authored a blood spatter analysis report that included opinions regarding the trajectory of the bullets. Detective Kraeer did not independently examine the vehicle, but rather based his report and opinions on photographs and evidence

taken from the vehicle during initial processing. All of that information had been provided to Appellant during the early phases of the discovery process.

On April 29, 2015, Attorney Patarini met with Martin Aronson (Office of the Public Defender Investigator) and Arthur Young (forensic DNA expert). During this meeting, Attorney Patarini called Detective McGee ostensibly to set up a time to examine the vehicle, but in the same conversation cancelled the request to examine the vehicle. Detective McGee testified that Attorney Patarini cancelled the request because an expert witness thought it would be a waste of time to inspect the vehicle. However, Attorney Patarini denied making such a statement.

On May 4, 2015, the Trial Court conducted a status conference on the case, and granted an extension for the time frame in which scientific discovery had to be produced. On that date Attorney Patarini requested that the vehicle be made available for inspection by his expert, Fred Wentling, and the Commonwealth agreed to set that up. Sometime after that, the Commonwealth learned from Coparts that the vehicle had been sold and shipped to the United Arab Emirates.

On May 5, 2015, Attorney Patarini arranged for Wentling to come to Pittsburgh to examine the firearm and vehicle. On May 6, 2015, Detective [Robert] Provident notified Attorney Patarini that the vehicle had been sold and transported to the United Arab Emirates. On May 7, 2015, Wentling came to Pittsburgh and examined the firearm. On May 11, 2015, the prosecution confirmed that the vehicle had been sold and was no longer available. Finally, on July 15, 2015, Appellant filed a motion to suppress the vehicle and all evidence derived therefrom.

Trial Court Opinion, 1/19/17, at 17-20 (citations, quotation marks, and footnote omitted).

Appellant's suppression claim is based upon the Fourteenth Amendment's Due Process Clause, which

requires defendants be provided access to certain kinds of evidence prior to trial, so they may "be afforded a meaningful opportunity to present a complete defense." This guarantee of

- 10 -

access to evidence requires the prosecution to turn over, if requested, any evidence which is exculpatory and material to guilt or punishment, see **Brady** [**v. Maryland**, 373 U.S. 83 (1963),] and to turn over exculpatory evidence which might raise a reasonable doubt about a defendant's guilt, even if the defense fails to request it, **see United States v. Agurs**, 427 U.S. 97 (1976). If a defendant asserts a **Brady** or **Agurs** violation, he is not required to show bad faith.

There is another category of constitutionally guaranteed access to evidence, which involves evidence that is not materially exculpatory, but is potentially useful, that is destroyed by the state before the defense has an opportunity to examine it. When the state fails to preserve evidence that is "potentially useful," there is no federal due process violation "unless a criminal defendant can show bad faith on the part of the police." Potentially useful evidence is that of which "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." In evaluating a claim that the Commonwealth's failure to preserve evidence violated a criminal defendant's federal due process rights, a court must first determine whether the missing evidence is materially exculpatory or potentially useful.

**Commonwealth v. Williams**, 154 A.3d 336, 339 (Pa.Super. 2017) (quoting

**Commonwealth v. Chamberlain**, 30 A.3d 381, 402 (Pa. 2011) (some

citations omitted)).

Appellant argues that the Lexus, as the crime scene itself and "the only evidence of the shooting at all," was exculpatory evidence. Appellant's brief at 54-56. He maintains that, without examining the vehicle, forensic scientist Fredrick Wentling was unable to reconstruct the shootings or render an opinion with the requisite degree of certainty on whether the physical evidence supported Appellant's version of events. **Id**. at 56.

- 11 -

Exculpatory evidence is "evidence which extrinsically tends to establish [a] defendant's innocence of the crimes charged." ***Commonwealth v. Woodell***, 496 A.2d 1210, 1212 (Pa. 1985) (internal quotation marks omitted). A claim that a defendant was denied access to exculpatory evidence must be supported; "it cannot be based on a mere assertion." ***Commonwealth v. Snyder***, 963 A.2d 396, 405 (Pa. 2009) (internal quotation marks omitted).

It is apparent that Appellant has no support for his claim that the Lexus contained exculpatory evidence; rather, his contention is that, if his expert had been able to examine the car, he **might** have found evidence that could have enabled him to opine that Appellant's self-defense narrative was forensically substantiated.

Evidence that possibly could have been exculpatory had it been available to be tested is potentially useful evidence, not exculpatory evidence. ***Chamberlain***, ***supra***, at 402 ("Evidence that is possibly exculpatory is only merely potentially useful."). Therefore, to prevail Appellant must establish that the Commonwealth acted in bad faith in failing to preserve the vehicle. Appellant offers the following argument.

> At several points, the prosecution (including the police) failed in their duty to preserve the evidence. Several discovery motions had been filed by the defense; it was well-known that the vehicle, as the crime scene itself, was a necessary piece of evidence. The Commonwealth promised to "take care of it" and make the vehicle available to the defense prior to trial. Yet nothing was done. The defense was not informed of any impending sale of the vehicle which would send it overseas. The

defense was not aware of the need for an Order of Court to retain the vehicle. The Commonwealth utterly failed in their duty to preserve the vehicle. While we do not suggest that this [was] done to intentionally hamper the defense, this is more than a one-time failure to properly act to preserve the evidence. At several points the Commonwealth failed to fulfill its duty to ensure fundamental fairness in [Appellant's] trial. This is bad faith. Failure to act when tasked with a duty to so act is bad faith.

Appellant's brief at 58-59. The trial court disagreed with Appellant's assessment, stating as follows.

Here, the police reasonably believed that the vehicle was being held at Coparts. The Commonwealth was not notified of the sale to the United Arab Emirates, and did not purposefully destroy the vehicle or take any measures to render it unavailable for inspection. The vehicle remained in police custody for over two months, and was available for defense inspection for eight months. At all times the Commonwealth was cooperative and accommodating to the several "half-steps" that Appellant made toward examination of the vehicle.

Trial Court Opinion, 1/19/17, at 21-22.

We agree with the trial court. The record does not reflect that the car was disposed of "in a calculated effort to circumvent the disclosure requirements," or that there was any "official animus towards [Appellant] or . . . conscious effort to suppress exculpatory evidence." *California v. Trombetta*, 467 U.S. 479, 488 (1984). Appellant had ample opportunity to examine the Lexus. The Commonwealth believed that the car would continue to be available. The most that Appellant can perhaps establish is that the Commonwealth was negligent in failing to obtain an order to return the vehicle to police custody; however, negligence is not bad faith. *See*, *e.g.*, *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (holding there was no suggestion of

bad faith where the failure to preserve evidence could "at worst be described as negligent"); **Chamberlain**, **supra**, at 389-403 (rejecting argument that the defendant was entitled to relief from the Commonwealth's loss of blood samples that the defendant sought to have DNA tested because "the Commonwealth's mishandling of the blood evidence was so grossly negligent that it actually amounted to bad faith").  Accordingly, we discern no error or abuse of discretion in the trial court's denial of Appellant's motion to suppress the Commonwealth's evidence obtained from the Lexus.

With his final issue, Appellant claims that he is entitled to a new trial because the trial court erroneously permitted Commonwealth expert Baiyang Xu, M.D., to testify "outside the scope of his expert report" and to offer opinion testimony that "exceeded Dr. Xu's technical expertise."  Appellant's brief at 7. Specifically, Appellant complains that Dr. Xu was permitted to testify (1) regarding the trajectory of the bullets; (2) that the stippling he observed near the entrance wounds on Mr. Eubanks's head indicated that the gun was fired within three feet of Mr. Eubanks; and (3) that the first shot to Mr. Eubanks's head may have been fatal.  **Id.** at 60.

There is no question that Dr. Xu, a medical doctor employed by the Allegheny County Medical Examiner's Office who testified more than thirty times as an expert in forensic pathology,[3] possessed the requisite expertise

---

[3] N.T. Trial, 10/15-19/15, at 547.

to offer testimony regarding the distance and direction of the shots that killed Mr. Eubanks. *See*, *e.g.*, *Commonwealth v. Mollett*, 5 A.3d 291, 305 (Pa.Super. 2010) (holding pathologist's testimony regarding the timing of gunshots and distance of the firearm "was well within his expertise"); *Commonwealth v. Guess*, 416 A.2d 1094, 1096 (Pa.Super. 1979) ("A physician who examines the gunshot wounds suffered by a decedent may give his opinion regarding the direction and distance from which such wounds were inflicted though that physician is not qualified as a ballistics expert.").

We also discern no abuse of discretion in the trial court's ruling that Dr. Xu could opine that the shot that entered Mr. Eubanks's head at the left ear was fatal.

> [E]xpert testimony is incompetent if it lacks an adequate basis in fact. While an expert's opinion need not be based on absolute certainty, an opinion based on mere possibilities is not competent evidence. This means that expert testimony cannot be based solely upon conjecture or surmise. Rather, an expert's assumptions must be based upon such facts as the jury would be warranted in finding from the evidence.

*Commonwealth v. Gonzalez*, 109 A.3d 711, 727 (Pa.Super. 2015) (citation omitted).

Here, Dr. Xu indicated that, because different people respond differently to wounds, he could not say whether the initial shot Mr. Eubanks sustained to his head in his left ear would have been immediately fatal, or whether Mr. Eubanks may have been able to move "a little bit" afterwards. N.T. Trial, 10/15-19/15, at 562-63. The opinion was not impermissible "conjecture or

- 15 -

surmise." *Cf. Gonzalez*, 109 A.3d at 727 (affirming exclusion of expert testimony that mental health conditions may have affected rape victim's perception and recollection). Rather, Dr. Xu explained that the bullet that entered Mr. Eubanks's left ear fractured his skull, traveled down from the front to back, and "stopped at the central back part of the skull." N.T. Trial, 10/15-19/15, at 558. Even without expressly stating that his opinion that the shot to the ear would have either killed Mr. Eubanks immediately, or allowed for only minimal movement thereafter, was rendered to "a reasonable degree of medical certainty," it is clear from his testimony that his opinion was based upon fact and not speculation. *Commonwealth v. Spotz*, 756 A.2d 1139, 1160-61 (Pa. 2000) (holding expert testimony was properly rendered to a reasonable degree of medical certainty although the doctor did not use the "magic words" where the doctor explained the medical basis for all of his conclusions).

Finally, to the extent that Dr. Xu's testimony was beyond the scope of his report, Appellant has not demonstrated that he was prejudiced. Dr. Xu's opinion was consistent with Appellant's testimony that he was located in the center of the Lexus's rear seat, and Mr. Eubanks was in the front passenger seat, when they struggled for the gun between them. According to Appellant's version of events, the gun muzzle would have been within three feet of Mr. Eubanks when it fired. Further, Dr. Xu indicated that his descriptions of the trajectories of the bullets were given "as if we are in the anatomically correct

position," and that he actually had no knowledge or opinion of the position of Mr. Eubanks's body at the time the wounds were inflicted. N.T. Trial, 10/15-19/15, at. 561. Hence, this portion of his testimony did not negate Appellant's self-defense claim.

Without any indication that Appellant was prejudiced by the testimony, no relief is due. ***Commonwealth v. Poplawski***, 130 A.3d 697, 718-19 (Pa. 2015) (holding claim that medical examiner's testimony as to the order of wounds and position of the victim's body when he was shot was outside of the scope of the report failed, although the report merely indicated the location of injuries based upon standard anatomical position without opining as to which wounds came first, where the defendant failed "to carry his burden of explaining how this admission of evidence prejudiced his defense").

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/1/2018

- 17 -