J-S38038-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                                 :        PENNSYLVANIA
                                                 :

             v.                           :

BLAIR ANTHONY WATTS          :
                                                 :
          Appellant               :     No. 601 EDA 2024

Appeal from the Judgment of Sentence Entered December 13, 2023
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0001698-2023

BEFORE: STABILE, J., BECK, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:         **FILED DECEMBER 9, 2024**

Appellant, Blair Anthony Watts, appeals from the judgment of sentence entered in the Montgomery County Court of Common Pleas on December 13, 2023, following a murder trial for the death of the victim, Jennifer Brown. After a careful review, we affirm.

The relevant facts and procedural history, aptly summarized by the trial court, are as follows:

> On January 4, 2023, N.M. Jennifer Brown's son, arrived at school wearing the same clothes as the day before and he had not taken his medication that kept his behavior under control, which was very out of the ordinary. (NT. Trial by Jury, V. I, 12/6/23, pp. 65-66, 70, 80, 81). Attempts were made by Brian Aikens, an emotional support teacher at the Springford School District, to contact the victim, but he never received a response. *Id.* 71, 76. Mr. Aikens was concerned by this and he made sure that the bus

---

[*] Former Justice specially assigned to the Superior Court.

driver brought N.M. back to school if his mother was not there at the bus stop at drop off. *Id.* at 77.

Also on that date, Anita Pallitto, the victim's mother, became worried about her daughter because she was unable to get in touch with her and she knew the school had been also trying to reach her. *Id.* at 85. She contacted Appellant, because N.M. was with him the night before. *Id.* Around 3:00 pm., she started to panic and asked Appellant to go to her daughter's house and try to get inside. *Id.* at 87-88. Soon after, Ms. Pallitto received a call from the bus company because her daughter was not at the bus stop to receive N.M., and they could not release him to Appellant who was waiting there for N.M. *Id.* at 89. She arranged for a neighbor who was an approved person to do so. *Id.* Ms. Pallitto testified that she knew her daughter was in business with Appellant and that she had given him money. *Id.* at 90.

Timothy McMenamin, N.M.'s bus driver, testified that on January 3rd, the victim was at the bus stop with her son in the morning, but she was not there for pick up, which never happened before. *Id.* at 95, 97. Rather, Appellant was there at pick up and got N.M. off the bus on that day. *Id.* at 97-98. On January 4th, Mr. McMenamin testified that Appellant was with N.M. at the bus stop that morning. *Id.* At the end of the school day, the bus driver was instructed not to let N.M. off the bus unless it was to an approved person, which Appellant was not. *Id.* at 103-104.

Around 4:30 p.m. on January 4, 2023, Corporal Fitz Duffy of the Limerick Police Department responded to a well-being check at 1408 Stratford Court, the victim's residence (N.T., Trial by Jury, V. 2, 12/7/23, p. 98). There was no response from inside the house. *Id.* at 99-100. Appellant was present at the scene, and he told the officer about an open window. *Id.* at 100. The officer went inside to search the house. *Id.* at 104. Appellant also told Corporal Duffy that the victim was a drug addict that used Percocets and needles. *Id.* at 102.

Patrol Sergeant Brian Tyler of the Limerick Township Police Department was also present at the well-being check at the victim's residence. *Id.* at 18, 109, 110. Appellant was there and speaking with other officers. *Id.* at 111. In an effort to create a timeline, Sergeant Tyler who assisted in the search of the victim's home, observed that there was a message on the victim's computer from January 3rd at 2:43 p.m. that went unanswered

and a reminder on the screen was not dismissed dated January 4th at 9:30 a.m. *Id.* at 115. Appellant told Officer Michelle Riley of the Limerick Township Police Department that he last saw the victim on January 3rd around 2:30 when he left her residence. *Id.* at 133. Appellant explained to the officer his business relationship with the victim, that she had invested $46,000 and owed him an additional $5,000. *Id.* at 134.

On January 5, 2023, Detective Mark Minzola of the Montgomery County Detective Bureau – Homicide Unit was asked to assist with the investigation by Limerick Township Police Department. *Id.* at 17, 18. In the course of the investigation, video surveillance was gathered. *Id.* at 19. Detective Minzola also obtained text messages from Appellant's phone from September 2022 through November 2022. *Id.* at 25. These messages revealed that over that period of time, the victim and Appellant were in constant communication. *Id.* at 27-46. They frequently arranged for N.M. to sleep at Appellant's house and to hang out with Appellant and his family. *Id.* During the various times that N.M. was with Appellant and his family, the victim consistently checked in with Appellant. *Id.* N.M. never slept over Appellant's house on a school night. *Id.* On the night of January 3rd, which was a school night, there were no text messages between Appellant and the victim. *Id.* at 46-47.

Tyerra Taylor, Appellant's wife, testified that Appellant had a restaurant business called Birdie's Kitchen, but that it closed in August of 2022. *Id.* at 53. Ms. Taylor knew the victim through Appellant, and knew that she was becoming Appellant's business partner. *Id.* at 53- 54. Appellant was trying to open a new Birdie's restaurant with the victim. *Id.* at 55, 57. On January 2nd, Ms. Taylor had dinner at the victim's house, and she heard her talking about the restaurant, that she was excited for it to open. *Id.* at 56-57, 58. Appellant also indicated that he was excited for the restaurant to open. *Id.* at 57.

On January 6, 2023, Officer Brian Quipple, along with his K9, Patton who were certified as a cadaver dog team, was contacted and asked to assist in the investigation of a missing person and he responded to Limerick Township Police Department. *Id.* at 183-184, 188. Officer Quipple and Patton, in relevant part, searched the victim's residence, and Patton gave indications of decomposition in the living room and kitchen. *Id.* at 191. On January 8, 2023, he responded to a garage at 122 Mill Road in Oaks where he and Patton searched a red Jeep Cherokee, which

Appellant was known to drive. *Id.* at 22, 196. Patton gave indications of decomposition to the driver's side rear door and floorboard. *Id.* at 196-197.

On January 6, 2023, Detective Jack Wittenberger of the Montgomery County Detective Bureau, took a voluntary statement from Appellant. *Id.* at 207-208. At the end of the statement, Appellant consented to the search of his cell phone and consented to a DNA swab. (N.T., Trial by Jury, V. 3, 12/11/23, p. 16).

Detective Terrance Lewis of the Montgomery County Detective Bureau – Forensic Services Unit processed Appellant's vehicle on January 8, 2023. *Id.* at 142, 143-144. There was red-colored dirt on the driver's side floor and on the rear and cargo area of the vehicle. *Id.* at 145-146. He took samples of this dirt. *Id.* at 148. The detective also recovered dirt samples from the shallow grave where the victim's body was located. *Id.* at 149.

On January 16, 2023, Tyler Shane, an employee at ATM Pump, located at North 5th Avenue, Royersford, was at work and outside the emergency exit of the building, he noticed some pallets arranged next to the building and some clumps of dirt on top of the grass, which caused concern since he had not seen that before. *Id.* at 110. At the direction of his supervisor he took pictures on January 17, 2023, as he approached the pallet he could see there was fabric, like a tarp, underneath. *Id.* at 111. He took a photograph. *Id.* at 1123.

On January 18, 2023, Lieutenant Edward Schikel of the Montgomery County Detective Bureau – Forensic Services Unit, responded to ATM Pump warehouse, and he observed the mounded dirt pile, which was the location of the burial site. *Id.* at 117, 121. The victim was removed from the shallow grave. *Id.* at 123, 127, 128.

Dr. Ian Saginor, a member of the FBI, was qualified as an expert in geology. *Id.* at 153, 160. He compared the red-colored dirt samples, and concluded that dirt from the vehicle cargo area "cannot be differentiated from one of the soils recovered from the grave site... by color, texture, and composition.["] *Id.* at 169, 178-179.

Dr. Ian Hood who was accepted as an expert in forensic pathology, conducted the autopsy. (N.T., Trial by Jury, V. 4,

12/11/23, p. 20). Based on his clinical findings, the fact the victim was recovered from a shallow grave, the lack of significant toxicology findings, there were no external injuries, and minimal injury upon his internal examination that were not lethal, and signs of hypoxia, he ruled her death as homicide by unspecified means – asphyxia not excluded. *Id.* at 23-26, 33-34. He included "asphyxia not excluded" because it is the most common way to kill someone and not leave a mark. *Id.* at 33. For instance, if the victim had some kind of padding over her head or neck and was being knelt on, that would cause death and still have a perfectly pristine body. *Id.* It was written as "not excluded" because he couldn't say for sure she died this way, but it is a mechanism of death that would lead to minimal findings. *Id.* at 34. Dr. Hood rendered this opinion to a reasonable degree of scientific certainty. *Id.* at 39.

At trial, the Commonwealth also presented evidence that Appellant had been trying to secure a lease for his new restaurant from Walter Zaremba around August or September of 2022. *Id.* at 112, 114. On December 28, 2022, Mr. Zaremba notified Appellant that he no longer wanted to lease the building to him. *Id.* at 128. Appellant became persistent trying to convince Mr. Zaremba to reconsider. *Id.* at 133. At one point Appellant became agitated and upset. *Id.* at 133-134. Appellant attempted to lease another location for his restaurant and contacted Michael Gola. *Id.* at 137. Appellant filled out a rental application, and on January 4, 2023, he contacted Mr. Gola about the status of that application. *Id.* at 141-144.

Meghan Gorman, a forensic accountant for the FBI, was accepted as an expert in forensic accounting. *Id.* at 145, 148. She reviewed the bank records for the victim and for Appellant. *Id.* at 149. She also reviewed CashApp and Zelle transactions. *Id.* In total, there were seven transactions between the victim and Appellant: August 29, 2022, the victim transferred money to Appellant via Zelle; August 30, 2022 the victim transferred $3500 to Appellant via a cashier's check; September 15, 2022, the victim wrote a personal check to Appellant; October 20, 2022, the victim transferred $2,600 via Zelle; December 2, 2022, the victim gave Appellant a cashier's check for $6,000; January 3, 2023, $8,000 was transferred to Appellant via Zelle; and on January 4, 2022, $9,00[0] was transferred to Appellant via CashApp. *Id.* at 152-158. Ms. Gorman testified that before many of these transactions, Appellant had very little money in his account or a negative

balance, and after the money was transferred to his accounts he either took cash withdrawals or the transactions from his accounts show[ing] that this money was used mainly on personal expenses, and nothing indicative of establishing a business. *Id.* at 158, 160-171.

Detective Minzola testified as to victim's cell phone and Google records. *Id.* at 184-185. The victim's Google email account contained a contract dated August 28, 2022, between her an Appellant setting up their business relationship. *Id.* at 185-187. Also the detective testified as to the text messages between the victim and Appellant in the time period of October 3, 2022 through January 3, 2023, and noted that there were over 4900 text messages during that time. *Id.* at 191. In these messages Appellant purportedly kept the victim up to date on the progress of the new restaurant. For instance Appellant discussed the color scheme for the new restaurant and various equipment he was trying to secure. *Id.* at 201, 208. On September 6, 2022, according to Appellant's texts he was going to be picking up the keys to the restaurant the following week. *Id.* at 209. On September 8th, Appellant represented that had acquired a new convection oven. *Id.* at 210. The flooring was being finished. *Id.* He even told the victim he was meeting to set up an event for the restaurant. *Id.* On September 13, 2022, Appellant's text represented that he was at the paint store and the kitchen was gutted. *Id.* at 212. On September 18th, Appellant obtained a stove and fryer. *Id.* at 213. Appellant even told the victim he was planning the menu for the restaurant, ordering business cards, and they discussed the restaurant website. *Id.* at 215-216. Over time, Appellant asked the victim for more money for the restaurant; and the victim transferred more money to Appellant's account. *Id.* at 201, 202, 205, 209, 210, 211. By the end of October, Appellant continued to ask the victim for additional funds, to get the restaurant ready. *Id.* at 219. By mid-November, Appellant told the victim that he needed a hood for the kitchen but that he couldn't afford it and asked the victim for more money in return for a larger ownership percentage of the business. *Id.* at 225-226. On November 21, 2022, Appellant indicated that he was getting the restaurant together for opening. *Id.* at 225. On December 16th, the victim told Appellant that they needed to get together to talk about timeline and financials. *Id.* at 227. By December 27th, Appellant told her that he is headed to the restaurant, and on January 2nd, he told her he will have the restaurant open by the end of the month. *Id.* at 228-229. The

detective noted that none of the texts mentioned that Appellant lost the lease on the restaurant location, or that he was looking for another location. *Id.* at 233-234.

On January 3rd, there were messages between the victim and Appellant at 9:40 a.m., 11:38 [a].m., 2:12 p.m., and at 2:18 p.m. she asked if he is coming by. *Id.* at 230-231. From 2:18 until 4:35 p.m., there are no messages, when at 4:35 p.m., a message from the victim's phone say[s], "Now we are 50/50 I can't wait," alleg[edly] referring to a new partnership agreement. *Id.* at 231. After 2:34 p.m., there was no more outgoing activity from the victim's phone, other than Appellant's use of her phone. *Id.* at 235.

Detective Minzola also obtained surveillance video, and in pertinent part, that depicted a vehicle of interest in the area of ATM Pump where the victim was found in the shallow grave. *Id.* at 250-253.

Agent Jeffrey Guagliardo, Special Agent with the FBI in Philadelphia assigned to the Violent Crimes Task Force, was qualified as an expert in historical cell site and location record analysis. (N.T., Trial by Jury, V. 3, 12/8/23, p. 75, 85, 86). Significantly, he testified as to the locations of the victim's and Appellant's cell phone records and Google location records on January 3rd and January 4th. (N.T., Trial by Jury, V. 5, 12/12/23, p. 8). This evidence provided a timeline for the jury to consider. Agent Guagliardo's testimony showed that Appellant's cell phone was at the victim's residence around 2:18 p.m. along with the victim's cell phone, the victim was last seen alive on surveillance at her local Wawa around 2:54 p.m., and that her cell phone returned to her residence 3:21 p.m. *Id.* at 14-18. Thereafter cell phone analysis and Google location data revealed that Appellant's cell phone was at the victim's residence between 3:21 p.m. until 4:11 p.m. on January 3, 2023. At 4:11 p.m., the victim's cell phone travelled to the bus stop; where the victim never arrived to get her son from the bus. However, surveillance video showed the vehicle of interest in that vicinity. *Id.* at 19. This indicated that sometime between 3:21 p.m. and 4:11 p.m., the victim was no longer in possession of her cell phone. Additionally, the agent testified that there were several failed CashApp transactions during the time the evidence showed Appellant was in possession of the victim's phone, in which there were attempts to transfer $9,000 from the victim's account to Birdie's Kitchen. *Id.* at 19-21.

Later, the victim's cell phone traveled to the area of TKO Pest Control, and surveillance during that time showed the vehicle of interest in that area. *Id.* at 24. At 4:23 p.m., the $9,000 CashApp transaction was successful. *Id.* at 24-25. Another CashApp transaction was attempted a few minutes later but was unsuccessful. *Id.* at 26. The victim's cell phone traveled back to the immediate area of her residence, and was there from 4:32 p.m. until 4:42 p.m. *Id.* at 27. There was a Zelle transaction from the victim's account to a phone number associated with Appellant. *Id.* at 28. Around 6:48 p.m., the victim's cell phone and Appellant's cell phones were in the area of his residence. *Id.* at 34-35. Appellant's cell phone was back in the area of the victim's residence around 6:55 p.m. *Id.* at 36. The victim's cell phone remained in her residence overnight, while Appellant's did not. On January 4, 2023, around 6:36 a.m., Appellant's cell phone was back in the area of the victim's residence, along with the victim's phone. *Id.* at 43-44. The last Google location record for the victim's phone was around 6:51 a.m., and between 6:48 and 6:57 a.m. the victim's cell phone and Appellant's cell phone traveled to the area of a Wawa near Appellant's residence. *Id.* at 43-45. This is consistent with testimony that the last ping of the victim's cell phone was within 400 meters of that Wawa location, and the testimony with the electronics K9 that indicated her phone was at that location although ultimately not recovered. *Id.* at 46-47. Image surveillance from that time period show the vehicle of interest approaching the Wawa. *Id.* at 47. On January 5, 2023, Appellant's cell phones went to the area of the burial site between 8:27 p.m. to 8:40 p.m. *Id.* at 52, 55. Between the times of 8:25 p.m. to 8:27 p.m., Appellant's cell phone records indicate being in the area of North 5th Avenue and Main Street, and this is consistent with video surveillance of the vehicle of interest traveling from Main Street to North 5th Avenue. *Id.* at 52-54.

At the conclusion of the trial, a jury found Appellant guilty of first-degree murder and he was sentenced to a life term of imprisonment on December 13, 2023. A timely post-sentence motion was filed on December 26, 2023, and denied on January 8, 2024. A timely notice of appeal was filed on February 8, 2024.

Tr. Ct. Op. at 1-14.

Appellant filed his 1925(b) statement on February 29, 2024. The trial court filed its opinion pursuant to 1925(a) on March 14, 2024. This appeal follows.

Appellant raises four issues for our review:

1. Was the Commonwealth's evidence, through its forensic pathology expert—even when accepted as true—insufficient as a matter of law in that it failed to present sufficient proof beyond a reasonable doubt of each and every element required for first degree murder—i.e., an intentional killing that is defined as one caused "by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing?"

2. Did the Commonwealth present an improper closing argument statement by telling the jury that malice—as a basis for a finding of guilt on a murder charge—in the instant case can be based on this defendant's alleged conduct subsequent to the alleged murder?

3. Did the trial court commit reversible error by allowing the Commonwealth to display to the jury a bloody and/or gory autopsy photograph that was not only irrelevant but also was inflammatory without the required substantial evidentiary value?

4. Did the trial court commit reversible error by not striking the Commonwealth's expert geology witness' entire testimony when that witness refused to testify, as required, that his testimony was to a reasonable degree of scientific certainty?

Appellant's Br. at 4-5.

Appellant frames his first issue as a challenge to the sufficiency of the evidence. However, Appellant's claim is really a weight of the evidence claim as his argument in support of his sufficiency claim challenges the reliability and credibility of expert witness, Dr. Hood's testimony. Appellant's Br. at 15. Specifically, he suggests that the jury put too much weight on the doctor's

testimony, and he challenges the terminology that Dr. Hood used in his report and his testimony. Appellant's Br. at 11-13. Given the doctor's use of "speculative" language, Appellant argues the expert opinion is not reliable. Appellant's Br. at 12.

Appellate review of the sufficiency of the evidence does not include an assessment of the credibility of testimony. *Commonwealth v. Smyser*, 195 A.3d 912, 916 (Pa. Super. 2018). Rather, credibility determinations are made by the finder of fact, and challenges to credibility go to the weight, not the sufficiency of the evidence. *Id.*; *see also Commonwealth v. Melvin*, 103 A.3d 1, 43 (Pa. Super. 2014) (explaining that challenges to the credibility of a witness's testimony go to the weight of the evidence and not its sufficiency). Here, Appellant challenges the credibility and reliability of Dr. Hood's testimony; thus, it is a weight claim.

A challenge to the weight of the evidence must be preserved orally or in writing prior to sentencing or in a post-sentence motion. Pa.R.Crim.P. 607(A). Here, although Appellant's appellate brief frames the issue as a sufficiency challenge, Appellant did file a timely post-sentence motion raising a weight of the evidence claim that is substantively similar to his appellate sufficiency claim. Additionally, the trial court addressed this issue as a weight of the evidence claim in its 1925(a) opinion. Accordingly, as our review is not hindered, we will address Appellant's first issue under the weight of the evidence framework.

To begin, we recognize that,

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Clay*, 64 A.3d 1049, 1054-55 (Pa. 2013) (citations and quotation omitted). In order for an appellant to prevail on a challenge to the weight of the evidence, "the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Commonwealth v. Sullivan*, 820 A.2d 795, 806 (Pa. Super. 2003) (citation omitted). The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. *Commonwealth v. Simmons*, 662 A.2d 621, 630 (Pa. 1995). The function of the fact finder is to pass on the credibility of witnesses and determine the weight to be accorded to a particular piece of evidence. *Id*.

Here, Appellant contends that Dr. Hood's testimony was unreliable for several reasons. First, Dr. Hood testified that "there were no immediate or obvious causes of death" and ruled the death attributable to homicide. Appellant argues that Dr. Hood's use of the phrase "attributable to homicide" is distinct from "caused by homicide," requiring the jury to engage in speculate and conjecture. Appellant's Br. at 12. Next, Appellant argues that the expert testified the death was caused by "unspecified means" and thus the expert did

not know and could not know the cause of death. Appellant's Br. at 13. Finally, Appellant argues that the expert testified that compression by asphyxia was "*a* mechanism" that caused the death, but not "*the* mechanism." Appellant's Br. at 13 (emphasis added). Appellant claims this language caused the jury to engage in speculation and conjecture. *Id*.

Appellant argues that his claim that the jury relied on speculation based on the expert's "uncertain" language is proven by the fact that the jury requested to see a copy of the medical examiner's report during deliberations. Appellant's Br. at 17. Although the trial court properly did not provide the jury the report, a re-reading of the pertinent portion of his testimony was granted to refresh their recollection. Approximately fifteen minutes after the re-reading, the jury reached its unanimous verdict of guilty of first-degree murder. *Id*. Appellant believes the jury was confused about the medical evidence's application to his charges. Appellant's Br. at 20.

Pennsylvania Rule of Evidence 702 governs expert testimony and states that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

(c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702. The comment to this rule states that when a qualified expert testifies, the weight of his testimony is for the trier of fact to determine. Pa.R.E. 702 cmt.

In this case, it is undisputed that Dr. Hood was a qualified expert as a forensic medical examiner.

> Expert testimony is incompetent if it lacks an adequate basis in fact. While an expert's opinion need not be based on absolute certainty, an opinion based on mere possibilities is not competent evidence. This means that expert testimony cannot be based solely upon conjecture or surmise. Rather, an expert's assumptions must be based upon such facts as the jury would be warranted in finding from the evidence.

*Commonwealth v. Ward*, 188 A.3d 1301, 1311 (Pa. Super. 2018). "Experts are not required to use 'magic words' and [] appellate courts must look to the substance of the expert's testimony to ensure the opinions were not based on mere speculation but instead had a reasonable degree of medical certainty." *Commonwealth v. Fitzpatrick*, 316 A.3d 987, 1006 (Pa. Super. 2024) (citing *Commonwealth v. Spotz*, 756 A.2d 1139 (Pa. 2000)).

In this case, Dr. Hood determined that the victim's death was caused by "homicide by unspecified means - asphyxia not excluded." N.T., 12/11/23, at 34. The victim did not have obvious injuries, and the doctor did not see an immediate or obvious cause of death. During the autopsy, he discovered three hemorrhagic rib fractures on the victim's left side. Because there was not an overlying bruise, Dr. Hood testified that it was "more likely the ribs were

cracked because the chest was being compressed." N.T., 12/11/23, at 24. Dr. Hood also found hemorrhages on the victim's sternocleidomastoid muscle, which is found in the neck, and on the end of her tongue. The doctor explained that tongue hemorrhages can occur if someone seizes as they die, which often occurs if the death is caused by hypoxia, or a lack of oxygen to the brain. N.T., 12/11/23, at 22-25.

Dr. Hood further explained that in cases where a person in good health with no other reason to be dead is found in a shallow grave, and there are no significant toxicological findings, the death is commonly classified as homicide by unspecified means. The doctor testified that his reason for the "asphyxia not excluded" notation was because asphyxia is the most common way to kill someone without leaving a mark. N.T., 12/11/23, at 33-34. Dr. Hood spent several minutes explaining to the jury the process of compressional asphyxia. N.T., 12/11/23, at 34-35. He concluded that the evidence was consistent with the victim being killed in a compressional asphyxia fashion. *Id.* at 36.

Regarding the expert testimony, the trial court opined:

> His opinion, which was held to a reasonable degree of scientific certainty, was that given the circumstances: the victim's body was found in a shallow grave, there were no external injuries, she had three fractured ribs, there was superficial hemorrhaging of the neck muscle, hemorrhaging of her tongue which indicated hypoxia, the victim was otherwise a healthy woman, the lack of a lethal injury, and the lack of a toxicology explanation for her death, that this was a homicide by unspecified means - asphyxia not excluded. He thoroughly explained why he designated this as a homicide by unspecified means and why asphyxia was not excluded. It was "unspecified" because there was no obvious lethal injury and "asphyxia not excluded" because

- 14 -

in his expert opinion a compression asphyxia would account for the lack of obvious lethal injury, the hemorrhaging of the tongue that indicated hypoxia, and the other clinical findings of note. This was his expert opinion, and he comprehensively explained the underpinnings of his opinion. Defense counsel tried to undermine Dr. Hood's credibility by focusing on terminology that Dr. Hood used in his report and in his testimony. Isolating this terminology counsel thought would cast doubt on the expert opinion in the mind of the jury. Dr. Hood explained on cross-examination the meaning behind the terminology. Counsel focused on these terms in isolation, in an attempt to disavow Dr. Hood's expert opinion as a whole. However, despite counsel's attempt to diminish his findings, Dr. Hood reiterated that his opinion [was] based on his clinical findings and his expert knowledge as a forensic examiner. Dr. Hood was qualified as an expert and was permitted pursuant to Pa.R.E. 702 to "testify in the form of an opinion..." Additionally, once a witness has qualified to testify as an expert, "the weight to be given such testimony is for the trier of fact to determine." Pa.R.E. 702 cmt. Ultimately, the jury credited the expert testimony as a whole, his findings, and explanations for these findings and found defense counsel's attempt to discredit that testimony unsuccessful.

Tr. Ct. Op. at 24-25.

We agree. Dr. Hood's testimony was based in a reasonable degree of medical certainty and was not speculative, and the jury was free to determine the weight to give the expert's testimony. In addition to the expert testimony, the jury heard evidence of, *inter alia*, the nature of Appellant's relationship and correspondences with the victim, the cellphone data showing Appellant in the victim's home around her time of death, cellphone data showing the victim's and Appellant's phones together the day after her murder, and the multiple attempts to transfer money from her phone to his restaurant. Accordingly, the verdict was not against the weight of the evidence.

- 15 -

Additionally, there is nothing in the record indicating that the jury was confused or was "unable to reach a verdict of first degree murder" as Appellant states in his 1925(b) statement. The court had instructed the jury that if they could not agree on first-degree murder, not to mark the verdict sheet as to first-degree murder and then proceed to deliberation on third-degree murder. N.T., 12/12/23, at 80-81. When the jury announced it had reached a verdict, the court clerk misspoke and asked the jury for its verdict on *third*-degree murder. The court clerk, who should have begun by asking the jury's verdict on *first*-degree murder, took the verdict anew starting properly with the jury's decision on first-degree murder. The jury foreperson then stated that they jury found Appellant guilty of first-degree murder. We are unpersuaded by Appellant's contention that the court clerk's mistake in saying "third" instead of "first" proves that the jury was confused about the evidence. N.T., 12/13/23, at 7-8.

Appellant's second issue challenges the trial court's denial of his request for a curative instruction after the Commonwealth's closing statement. Appellant's Br. at 22. Specifically, Appellant argues that the Commonwealth erroneously told the jury that a finding of "malice" can be based on the Appellant's alleged conduct subsequent to the victim's death. *Id*. Both the trial court and the Commonwealth assert that Appellant did not preserve the challenge to the trial court's refusal to provide a curative instruction. *See* Tr. Ct. Op. at 31; See Appellee's Br. at 22.

To preserve a challenge to the adequacy or omission of a particular jury instruction, the defendant must make a specific and timely objection to the instruction at trial before the jury deliberates. **See Commonwealth v. Smith**, 206 A.3d 551, 564 (Pa. Super. 2019); **see also** Pa.R.Crim.P. 647(C) ("No portions of the charge nor omissions from the charge may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate."). More specifically, this Court has held that the lack of a contemporaneous objection constitutes a waiver of any challenge to the prosecutor's closing remarks. **Commonwealth v. Powell**, 956 A.2d 406, 423 (Pa. 2008) (providing that the "absence of a contemporaneous objection below constitutes a waiver of appellant's current claim respecting the prosecutor's closing argument"); **Commonwealth v. Butts**, 434 A.2d 1216, 1219 (Pa. 1981) (providing that the failure to object during or after summation constitutes a waiver of prosecutorial misconduct claim).

Here, following the Commonwealth's closing statement, the court read the jury instructions, the jury retired to deliberate, and the alternate jurors were dismissed. N.T., 12/13/23, at 189-94. Defense counsel then requested a curative instruction regarding the prosecutor's discussion of malice, which the court denied. **Id**. at 195.

We find that Appellant failed to preserve this issue for appellate review because his counsel did not assert any objection, let alone a contemporaneous objection, to the prosecutor's above-referenced remarks.

Appellant argues that requesting a cautionary instruction "immediately after" jury instructions, before the jury finished deliberating, was timely. Appellant's Br. at 24. However, there was no objection at all by defense counsel. The mere submission and subsequent denial of a jury instruction will not suffice to preserve an issue, absent a specific objection or exception to the trial court's ruling respecting the points. **Commonwealth v. Pressley**, 887 A.2d 220, 225 (Pa. 2005). Accordingly, this issue is waived.[1]

Appellant's third issue is that the trial court erred in admitting three autopsy photographs. Specifically, Appellant claims that the purported probative value of the photographs was outweighed by the danger of unfair prejudice. Appellant's Br. at 25. The trial court determined in part that since the cause of death was in dispute, the photographs were necessary for Dr. Hood to explain his expert opinion to the jury. Tr. Ct. Op. at 32.

The admissibility of evidence lies "within the sound discretion of the trial court, and a reviewing court will not reverse the trial court's decision absent

---

[1] Even if we were not to find this issue waived, it is meritless because the prosecutor's remark was not improper. The Commonwealth told the jury that in considering if "malice" was shown, the jury must consider all of the evidence including the conduct of the actors involved. N.T., 12/12/23, at 154-55. The Commonwealth went on to discuss Appellant's conduct following the victim's death. **Id.** at 154-88. Appellant submits that "malice" pertains to an accused's state of mind at the time of the killing, not after. Appellant's Br. at 22. However, "malice is inferred from the totality of the circumstances, not just the circumstances occurring before and during the [murder]. Actions of the accused that occur before, during, and after are admissible as evidence to show malice." **Commonwealth v. Gonzalez**, 858 A.2d 1219, 1223 (Pa. Super. 2004).

a clear abuse of discretion." **Commonwealth v. Young**, 989 A.2d 920, 924

(Pa. Super. 2010) (citations omitted).

> When the Commonwealth seeks to introduce photographs of a homicide victim into evidence, the trial court must engage in a two-part analysis. First, the trial court must examine whether the particular photograph is inflammatory. **Commonwealth v. Murray**, . . . 623 Pa. 506, 83 A.3d 137, 156 (Pa. 2013). If the photograph is not inflammatory, it may be admitted if it is relevant and can serve to assist the jury in understanding the facts of the case. **Id**. If the photograph is inflammatory, the trial court must determine whether the photograph is of such essential evidentiary value that its need clearly outweighs the likelihood of inflaming the minds and passions of the jurors. **Id**.

**Commonwealth v. Woodard**, 129 A.3d 480, 494 (Pa. 2015).

Prior to Dr. Hood's testimony, defense counsel raised an objection to the admission of three photographs. N.T., 12/11/23, at 7-8. The photographs were in color and showed the interior of the victim's chest, rib area, and the victim's tongue. Arguments by the Commonwealth and defense counsel were placed on the record. **Id.** at 8-9. The court ultimately decided to admit the photographs providing the following reasons:

> I do find that the probative value does far exceed the prejudicial impact, that it's necessary.
>
> In many of these cases the cause and manner of death is not in dispute. That's not true here, so the expert pathologist will need to explain his opinion, and the photographs will be displayed briefly to allow him to do that, and the district attorney will orient him first by showing him he photograph, and the photographs will be up on the screen no more than ten seconds per photograph.

N.T., 12/11/23, at 8.

The record further discloses that the trial court issued a cautionary instruction to the jury prior to the photographs being admitted. The trial court instructed the jury that there will be some unpleasant testimony from the forensic pathologist and that photographs will be shown during that testimony for about ten seconds in order to aid the witness and explaining his opinion. N.T., 12/11/23, at 8-10. The court cautioned the jury not to let any unpleasant testimony—such as the photographs—stir up emotions, and reminded the jury that the verdict must be based on rational and fair considerations of all the evidence. N.T., 12/11/23, at 10-11. Two of the photographs were admitted at trial during Dr. Hood's testimony, and he explained what each photograph depicted prior to them being briefly published to the jury. N.T., 12/11/23, at 29.

> Relevantly, the trial court notes the following:
>
> In this case at issue was the cause of death, which was complicated as there was a lack of obvious lethal injuries externally or internally. Dr. Hood had determined that this was a "homicide by unspecified mean – asphyxia not excluded." It was important for the jury to visually see the fractures to the ribs and the minimal injuries surrounding them and the minimal injuries to the superficial neck muscles. *In fact, these photographs were just as important for what they did not show as to the injuries that were shown.* These were key clinical findings that guided Dr. Hood's ultimate determination, and the photographs aided him in explaining his expert opinion. These photographs were extremely relevant and the probative value outweighed any prejudicial effect.

Tr. Ct. Op. at 35 (emphasis added).

We agree. Our review of the photographs discloses that they are not inflammatory and would not shock the sensibility of the viewer, given the nature of the expert's testimony and the clinical significance of the injuries, and given that the photos were only shown for a few seconds. Significantly, the photos were of evidentiary value to explain Dr. Hood's testimony regarding the non-obvious nature of the injuries sustained by the victim. In particular, the photos had evidentiary value to explain Dr. Hood's testimony and his conclusion in the autopsy report. **See generally Woodard**, 129 A.3d at 494. Accordingly, we discern no abuse of the trial court's discretion in admitting the photographs.

Appellant's fourth issue challenges the testimony of FBI Geologist Dr. Saginor, the Commonwealth's expert geology witness. Specifically, Appellant argues that the testimony should have been stricken from the record because he claims the opinion was not expressed with reasonable certainty. Appellant's Br. at 26.

Before we address this claim, we must first determine whether Appellant preserved it for our review. In order to preserve an evidentiary challenge for appellate review, a defendant must make a timely and specific objection to the evidentiary ruling. **See Commonwealth v. Thoeun Tha**, 64 A.3d 704, 713 (Pa. Super. 2013) (holding that an appellant's failure to raise a contemporaneous objection to evidence at trial waives that claim on appeal); **see also Commonwealth v. Baumhammers**, 960 A.2d 59, 73 (Pa. 2008)

(holding that in order to preserve an issue for appellate review, a party must make timely and specific objection to ensure that the trial court has an opportunity to correct the alleged error); Pa.R.E. 103(a) (providing that an "[e]rror may not be predicated upon a ruling that admits or excludes evidence unless . . . a timely objection . . . appears of record"); Pa.R.A.P. 302(a) (providing that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal").

Here, Appellant states in his brief that Dr. Saginor's "entire testimony should have been stricken *as requested*." Appellant's Br. at 26 (emphasis added). Appellant does not indicate when or how the "request" was made for Dr. Saginor's testimony to be stricken, and he provides no citation to the record to show that this issue had been raised in the trial court.

Our review of the record shows that defense counsel at no time objected to Dr. Saginor's testimony. On cross examination, defense counsel asked Dr. Saginor to clarify if his opinion was to a degree of scientific certainty, but still did not make any objections. N.T., 12/8/23, at 182. Accordingly, because there was no objection to this expert's testimony, this issue on appeal is waived.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/9/2024